FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ MAY 24 2012 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

ROMAN VEGA a/k/a "BOA", ICQ USER NO. 107711, ROMAN STEPANKO, RANDY RIOLTA

Defendant.

7-CR-707 (ARR)

NOT FOR PRINT OR ELECTRONIC PUBLICATION

OPINION & ORDER

ROSS, United States District Judge:

Defendant, Roman Vega ("Vega"), entered a plea of guilty on January 26, 2009 before me to one count of conspiracy to commit access device fraud, in violation of 18 U.S.C. § 1029, and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). Defendant now seeks to withdraw his guilty plea prior to sentencing pursuant to Federal Rule of Criminal Procedure 11(d)(2)(B). For the reasons set forth below, defendant's motion to withdraw his guilty plea is denied.

## I. BACKGROUND

Defendant, a Ukrainian citizen, reaches this court after his continued incarceration since his arrest in Cyprus in February of 2003 for credit card theft, among other cyber-crimes, in connection with his involvement with the websites www.boafactory.com and www.carderplanet.com, marketplaces for online criminal activity including the sale of stolen credit card data and false identities. Affidavit of Special Agent Wilson ("Wilson Aff.") at ¶¶ 21-24. Following his February 26, 2003 arrest by Cypriot authorities near a shopping mall in Nicosia, Cyprus, defendant led the arresting officers to his hotel room, where they confiscated

one or more laptops, including a Sony Vaio, which upon inspection contained thousands of credit card numbers, data, identity documents and internet communications demonstrating defendant's involvement in a network of cyber-crime, specifically involving the sale of credit card information via an internet marketplace. Defendant was convicted in Cyprus and remained incarcerated there until May 2004.

In May 2004, Cypriot authorities detained Vega pursuant to a provisional arrest request made by the United States Attorney for the Northern District of California. According to the government, on May 7, 2004, at the request of Cypriot authorities, defendant signed an affidavit, drafted in Greek, consenting to his extradition to the Northern District of California. Defendant denies that he signed this document, contending that the signature is forged. The disputed affidavit includes statements by Vega agreeing to surrender the rights afforded him under the Extradition Agreement between the United States and Cyprus, and consenting to his transfer to the United States to answer the pending charges. Dkt. 78-1.

Defendant was subsequently transported to the Northern District of California in June 2004, where he was arraigned on forty counts of wire and access device fraud. On November 9, 2006, after filing a motion objecting to the legality of his extradition but before the court's ruling, defendant abandoned his challenge and pleaded guilty to twenty counts of fraud relating to twenty illegal credit card transactions.[1] On November 9, 2007, he was arraigned in the Eastern District of New York on a two-count indictment charging conspiracy to commit access device fraud and conspiracy to commit money laundering, and entered a plea of not guilty. Soon thereafter, he began efforts to cooperate with the government and, after a series of proffer sessions in which he admitted his role in the conspiracy, Wilson Aff. at 4-16, he entered a plea of guilty to both counts pursuant to a cooperation agreement.

[1] Defendant has not yet been sentenced in the Northern District of California action.

At the outset of his sworn guilty plea allocution on January 26, 2009, the colloquy focused on Vega's ability to proceed without the assistance of a Russian interpreter. In response to my inquiries, Vega averred that although not "totally fluent" in English, he understood and read the language "perfectly," having no difficulty in either comprehension or communication, but occasionally experienced problems with correct grammar. Gov. Mem. Ex. 11 ("Tr.") at 4. His attorney, Michael Padden, Esq., confirmed that throughout his lengthy representation of Vega, primarily at Vega's request but with Padden's concurrence, the two had always conversed in English, which Vega "fully under[stood]," and the prosecutor added that all of Vega's proffer sessions with the government, except the first, were conducted – at defendant's request – without the use of an interpreter. Id. at 6-7. Vega then reasserted to me his desire to proceed with the allocution without the services of an interpreter. Id. After confirming that he had not recently sought the care of a physician or psychiatrist, Vega reassured me that his mind was clear and he fully understood the proceedings, assurances echoed by his counsel, and Vega expressed satisfaction with Mr. Padden's representation of him. Id. at 9-10, 14.

I then proceeded to review with Vega the trial and other constitutional rights he would be waiving by pleading guilty and insured that he understood the two charges against him. Id. at 8-19. As Vega put it, he also "absolutely" understood the terms of his cooperation agreement "in full" and was also aware of the penalties to which he would be subjected by pleading guilty. Id. at 14. Upon entering the plea, he affirmed that he was doing so "voluntarily and of [his] own free will" and without threats, force or coercion. Id. at 20.

Vega was then asked to relate his criminal conduct without reference to the copy of the indictment he held. With respect to the charge of Conspiracy to Commit Access Fraud, Vega explained, in part, in response to my questions, that he had "particip[ated] in a credit card

account selling and exchanging" scheme with others involving the unauthorized "acquiring and selling [of] credit card numbers," bank identification numbers, and credit verification codes to fraudulently obtain money. Id. at 23-24. When the prosecutor interjected that defendant had not only obtained but had also sold the information described, Vega confirmed: "Yes, it's exactly what I told [you] already . . . ." Id. at 24. Asked about his conduct in connection with the money laundering charge, Vega explained, in part, that because he had been "out of the United States," his clients paid him by "using Western Union or wire transfers," in transactions that intentionally concealed that the funds were involved in the illegal credit card scheme. Id. at 27. At the conclusion of the proceeding, I accepted Vega's guilty plea, finding that he had had allocated voluntarily and with a full understanding of the consequences of his plea, and that there was a factual basis for the plea. Id. at 29.

More than two years later, on April 4, 2011, defendant filed a letter stating: "I hereby am officially terminating and rescinding my offer to proffer [with the government] as well as the cooperation agreement with the United States." Dkt. No. 34. Among his reasons, he expressed "concern" that he had entered an "unknowing and thus unconstitutional" guilty plea due to his poor grasp of the English language and his severe dental problems. On April 5, 2011, now proceeding pro se with court-appointed standby counsel, Vega moved to withdraw his January 2009 guilty plea pursuant to Rule 11(d)(2)(B), principally on the ground that his former counsel had been ineffective in advising him to enter the plea. Dkt. No. 35. Specifically he faults counsel for failing to defend the charges by arguing (1) that three computers taken from his hotel room containing evidence of credit card fraud were seized by Cypriot authorities in violation of the Fourth Amendment and should have been suppressed; (2) that he was unlawfully extradited to the United States from Cyprus; and (3) that the indictment filed against him in the Eastern

District of New York violates the rule of speciality in the United States-Cyprus extradition treaty. According to Vega, his former counsel's failure to pursue these issues constituted ineffective assistance of counsel, leading to his unknowing and involuntary guilty plea. As part of the motion, Vega also asserts his actual innocence of the crimes to which he pleaded guilty.[2]

## II. DISCUSSION

Rule 11 of the Federal Rules of Criminal Procedure provides that a defendant may withdraw a guilty plea that has been accepted by the court but prior to sentence if he can show "a fair and just reason for requesting the withdrawal." Fed. R. Crim. Proc. 11(d)(2)(B). "'[A] defendant has no absolute right to withdraw his plea of guilty,'" however. United States v. Karro, 257 F.3d 112, 117 (2d Cir. 2001) (quoting United Staes v. Avellino, 136 F.3d 249, 261 (2d Cir. 1998)). While Rule 11 "implies that motions to withdraw prior to sentence should be liberally granted, a defendant who seeks to withdraw his plea bears the burden of satisfying the trial judge that there are valid grounds for withdrawal." United States v. (Jose) Gonzalez, 970 F.2d 1095, 1100 (2d Cir. 1992). The reason for withdrawal must be compelling because "society has a strong interest in the finality of guilty pleas, and allowing withdrawal of pleas 'undermines confidence in the integrity of our [judicial] procedures . . . , increas[es] the volume of judicial work, [and] delays and impairs the orderly administration of justice.'" United States v. Maher, 108 F.3d 1513, 1529 (2d Cir. 1997) (quoting United States v. Sweeney, 878 F.2d 68, 78 (2d Cir. 1989) (per curiam)). Factors the court should consider in deciding a motion to withdraw include, among others: "(1) the amount of time between the plea and the motion to withdraw, (2) whether the defendant is now asserting [his] legal innocence, and (3) the prejudice, if any, to the government." United States v. Doe, 537 F.3d 204, 210 (2d Cir. 2008) (citing United States v.

[2] On August 11, 2011, Vega filed a supplemental motion restating his earlier claims, and adding that the conditions of his confinement, his difficulties with the English language, and his suffering from untreated head and dental injuries also contributed to his guilty plea, undermining its voluntariness.

Couto, 311 F.3d 179, 185 (2d Cir. 2002)). Moreover, "[a] defendant is not entitled to an evidentiary hearing on the matter of withdrawal unless he presents 'some significant questions concerning the voluntariness or general validity of the plea . . . .'" (Jose) Gonzalez, 970 F.2d at 1100. Indeed, "no hearing need be granted when the allegations on a motion to withdraw a guilty plea before sentencing merely contradict the record, are inherently incredible, or are simply conclusory." Id.

Before examining the factors informing the appropriateness of relief, I turn to the threshold issue of whether Vega has provided any compelling reason justifying withdrawal of his guilty plea.

a. **Ineffective Assistance of Counsel**

The core rationale Vega advances in support of his request to withdraw his guilty plea is that the plea was involuntary and unknowing due to the ineffective assistance of his former counsel. As noted, Vega maintains that his former counsel, Michael Padden, failed to challenge, (1) the seizure by Cypriot authorities of evidence derived from laptop computers that was turned over to United States authorities and contributed significantly to the charges against him, and (2) the validity of his extradition to and indictment in the Eastern District of New York under the terms of the extradition treaty between Cyprus and the United States. Construing Vega's pro se motion liberally, he argues that had competent counsel investigated and made him aware of the facts and legal standards associated with these challenges, he would not have pleaded guilty.

"Ineffective assistance of counsel during plea negotiations can invalidate a guilty plea and make granting withdrawal appropriate to the extent that the counsel's deficient performance undermines the voluntary and intelligent nature of defendant's decision to plead guilty." United States v. Arteca, 411 F.3d 315, 320 (2d. Cir. 2005). When evaluating a claim that a guilty plea is

"involuntary or unknowing due to ineffective assistance of counsel, [the court] uses the familiar framework established in Strickland v. Washington, 466 U.S. 668 (184)." United States v. Hernandez, 242 F.3d 110, 112 (2d Cir. 2001). Under that framework, the defendant must establish that (1) "counsel's representation fell below an objective standard of reasonableness," and (2), "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 58-59 (1985). Of course, failure to make a "meritless argument does not fall outside the 'wide range of professionally competent assistance'" to which a criminal defendant is entitled. Aparicio v. Artuz, 269 F.3d 78, 99 (2d Cir. 2001).

Finding without merit both claims that, according to Vega, his former counsel should have pursued, I conclude that defendant has failed to establish either prong of the Strickland test. Moreover, given the circumstances of Vega's guilty plea pursuant to a cooperation agreement and its attendant benefits, I conclude that defense counsel's advice that Vega enter a guilty plea was objectively reasonable.

1. *The Absence of a Suppression Motion*

Vega's first attack upon counsel's effectiveness is grounded upon counsel's failure to move to suppress evidence obtained by Cypriot police from laptops found in Vega's hotel room following his arrest, which Vega alleges formed the bulk of the evidence against him. According to Vega, the seizure of this evidence violated the Fourth Amendment of the United States Constitution because it was taken without a warrant or his consent. Also according to Vega, it was subject to the exclusionary rule in United States courts because United States law enforcement agents were "involved in" the overseas investigation and provided "mutual assistance" to Cypriot authorities. See Mapp v. Ohio, 367 U.S. 643 (1961). Both arguments are

flawed. In fact, the search and seizure requirements of the Fourth Amendment apply to evidence seized in a foreign jurisdiction only in very narrow circumstances. Where evidence is seized abroad, the Fourth Amendment—and its exclusionary rule — have no application unless the defendant establishes substantial, voluntary connections with the United States, proof that Vega does not and cannot adduce here. Nor can Vega allege or establish sufficient involvement of United States officials in the disputed search and seizure to justify invoking the Fourth Amendment even on behalf of one with a substantial connection to the United States.

In United States v. Verdugo-Urquidez, 494 U.S. 259 (1990), the Supreme Court expressly held that the Fourth Amendment does not apply to the search and seizure of property of foreign nationals abroad. In Verdugo-Urquidez, agents from the United States Drug Enforcement Agency ("DEA"), suspecting that the Mexican residence of the defendant—also a Mexican citizen—contained evidence of narcotics trafficking, kidnapping, torture, and murder, entered the defendant's residence and seized substantial quantities of narcotics without a search warrant. 494 U.S. at 262-63. The Supreme Court held that the text and history of the Fourth Amendment compelled the conclusion that its search and seizure provisions "ha[ve] no application" abroad to foreign nationals. Id. at 274-75; United States v. Coke, 07 CR 971(RPP), 2011 U.S. Dist. LEXIS 94012, at *13 (S.D.N.Y. Aug. 23, 2011) ("[W]here a defendant is not a United States citizen, and has no substantial, voluntary attachment to the United States, and the search at issue occurs abroad, the Fourth Amendment has no application.") (internal quotation marks omitted).[3] Here the defendant is not a citizen of the United States, he was not in the United States when he was arrested, and his only recent attachment to the United States involved

[3] The rule is in contrast to the one that governs searches and seizures of United States persons abroad, whom this circuit has held are covered by at least some of the protections of the Fourth Amendment. See In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 157, 167 (2d Cir. 2008) (finding that while the warrant clause of the Fourth Amendment does not apply to searches of the property of U.S. persons abroad, the reasonableness requirement does apply).

the extraordinary international reach of his credit card fraud. Because the defendant is a foreign

national abroad and the evidence was seized abroad, the warrant and reasonableness

requirements of the Fourth Amendment—and thus, the exclusionary rule—do not apply.

Even if the defendant could establish a voluntary and substantial connection with the

United States, however, a motion to suppress the laptop evidence would still be meritless. The

laptop was allegedly seized without a warrant and without Vega's consent by Cypriot authorities.

Evidence seized abroad by foreign officials may only be excluded from a United States court if

United States officials "cooperat[e] with foreign law enforcement officials [in a manner that]

may implicate constitutional restrictions." United States v. Maturo, 982 F.2d 57, 61 (2d Cir.

1992). In order to show such cooperation, however, the defendant must establish either: "(1)

[that] the conduct of foreign law enforcement officials rendered them agents, or virtual agents, of

United States law enforcement officials; or (2) [that] the cooperation between the United States

and foreign law enforcement agencies is designed to evade constitutional requirements

applicable to American officials." Id. Parallel, or even mutually cooperative investigations

between the United States and foreign law enforcement agencies, however, fail to establish the

agency relationship necessary to exclude the evidence. As the Court of Appeals explained,

"[t]he investigation of crime increasingly requires the cooperation of foreign and United States

law enforcement officials, but there is no reason to think that Congress expected that such

cooperation would constitute the foreign officials as agents of the United States." Id. (citations

omitted). Defendant alleges no facts suggesting any kind of agency relationship between Cypriot

authorities and United States law enforcement officials, or that any cooperation between Cypriot

and United States agencies was designed for the purpose of violating defendant's constitutional

rights.

A person in defendant's circumstances may still succeed in excluding evidence where the government's conduct in pursuit of that evidence violates his due process rights under the Fifth Amendment. To prevail on such a claim, the government's method of acquiring the evidence must be so egregious that it "shocks the conscience." United States v. Salerno, 481 U.S. 6379, 746 (1987). Defendant falls well short of alleging facts that "shock" the judicial conscience. Defendant claims that Cypriot authorities arrested him and brought him to his hotel room, where he was surprised to see an unwanted guest operating three computers in his room. Def. Mot. at ¶4. At most, defendant alleges that the computers were seized without a warrant, and without knowing to whom the computers belonged. Id. at ¶ 9.[4] Courts exclude evidence on due process grounds, however, only in circumstances of extreme misconduct. See United States v. Schmidt, 105 F.3d 82, 91 (2d Cir. 1997) (citing examples such as forcible extraction of accused's stomach, or six days of continuous interrogation). Nothing in defendant's submissions suggests that any authority acted so egregiously—e.g. with violence, or excessive intimidation—when securing the computer evidence.

Finally, Vega argues that there is a "possibility" that the United States Postal Inspector investigating the case improperly tampered with the hard drive that inculpated Vega. In Vega's view, this "possibility" of tampering arises from the fact that Vega has not yet seen evidence of the "chain of custody" of information derived from the computer hard drive from the time of its seizure in Cyprus through the analysis of its contents here. But Vega offers no factual basis to support his claim that the data "might" have been tampered with other than his own "bald

[4] Defendant argues that Postal Inspector Gregory Crabb's references in his affidavit to his receipt of a "hard drive" from Cypriot authorities, which conflicts with defendant's account that the hotel room contained three laptops, undermines Crabb's credibility in connection with the determination of whether any computer data seized belonged to Vega. Apart from the illogic of doubting the source of the laptop evidence based on a discrepancy in the number of seized laptops, Vega's ownership of the seized hard drive, which he confirmed in subsequent proffer sessions with the government, was also independently established by the presence on the hard drive of Vega's identity documents and known aliases. Wilson Aff. at ¶ 24-28.

assertion of innocence." United States v. Hirsch, 239 F. 3d 221, 225 (2d Cir. 2001). That assertion, which is contradicted by Vega's own sworn statements at his guilty plea, and his proffers to the government, lend no support to his speculative assertion that the evidence may have been altered.[5]

For the above reasons, any motion to suppress the evidence seized from the hard drives of defendant's laptop would have been meritless, if not frivolous. Accordingly, counsel's failure to pursue such claims did not fall outside of the "wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.

2. *Failure to Challenge Vega's Extradition and Alleged Violation of the Rule of Speciality*

Vega also claims that his counsel was ineffective for failing to mount two challenges to his prosecution in the Eastern District of New York: (1) that his extradition to the United States was unlawful because his waiver of an extradition hearing in Cyprus was fabricated; and (2) that the two instant conspiracy counts violate the Rule of Speciality in the United States-Cyprus extradition treaty. Because both challenges to this court's jurisdiction would have been meritless, Vega cannot show that he would not have pleaded guilty had his former counsel brought them to his attention, nor can he establish that counsel was ineffective in failing to pursue them.

A. Improper Extradition

Vega argues that the written waiver of extradition allegedly executed in Cyprus, Gov't Mem. Ex. 1, was fabricated, and that his extradition was therefore unlawful. Observing that the

---

[5] Vega appends to his reply papers on this motion a letter dated March 20, 2003 from a Secret Service agent to the Chief of the Cyprus National Police regarding a preliminary forensic examination by the Secret Service of the seized hard drives, and the preliminary findings of the Secret Service relating to the presence of counterfeit credit card information in the hard drives. Nothing in this letter indicates that any evidence was tampered with or improperly handled. See Def.'s Reply, Ex. G.

waiver affidavit is written in Greek, which, he asserts he could not read, speak, or understand, and that the alleged signature on the document is forged or photocopied, he speculates that the "Cypriot Police acting under pressure and in conjunction with [U.S. law enforcement] created the false document in order to obtain [his] extradition and foster a fraud upon the San Francisco court and this court." Def. Mem. At ¶ 15. Notably, Vega's factual assertions conflict with his own sworn statements.[6] Even crediting his most recent account, however, he fails to assert any potentially meritorious ground for challenging his extradition that his former counsel should have pursued.

As a general rule, the method by which a criminal defendant is brought within the jurisdiction of a federal court, even if unconventional, does not deprive a court of jurisdiction over that defendant. Under the longstanding principles of the Ker-Frisbie doctrine, "[t]he power of a court to try a person for crime is not impaired" if he is brought within the jurisdiction of a United States court by means of "forcible abduction." Frisbie v. Collins, 342 U.S. 519, 522 (1952) (citing Ker v. Illinois, 119 U.S. 436, 555 (1886)). This is so even where there is a valid extradition treaty between the United States and the country from which a criminal defendant is transferred. For instance, in United States v. Alvarez-Machain, the Supreme Court held that even the forcible abduction of a criminal defendant in Mexico by DEA agents did not deprive the district court of jurisdiction, despite the existence of an extradition treaty between the United States and Mexico, where the treaty did not have an explicit prohibition against other methods of transferring custody. 504 U.S. 655, 657 (1992). An extradition treaty serves only to "provide[] a

[6] In his affidavit in support of his motion advancing the identical argument in the Northern District of California, Vega admitted that the waiver document had been translated into English for him. Gov't Mem., Ex. 3 ("Vega Decl. Supp. Mot. Suppress"), at ¶ 11. Vega did not argue an inability to understand the waiver document, nor did he contend that his signature had been forged or otherwise fabricated. Further, defendant stated that he signed the document "out of fear of long-term custody and intimidation" by the arresting detective whom he had witnessed beating fellow inmates. He did not argue, as he does now, that he did not understand the document or that the signature was fabricated. Id. at ¶ 13-14.

mechanism which would not otherwise exist, requiring, under certain circumstances, the [signatory countries] to extradite individuals to the other country, and establishes procedures to be followed when the Treaty is invoked." Id. at 664-65. Where the United States gains custody over a defendant by some means other than formal extradition procedures, however, the Ker-Frisbie doctrine applies, and the defendant is properly within the jurisdiction of the court to which he is brought. See United States v. Herbert, 313 F. Supp. 2d 324, 330 (S.D.N.Y. 2004) (finding that defendant is properly before United States court when "tricked" into coming to the United States, notwithstanding the existence of an extradition treaty).

At the very most, Vega alleges that United States and Cypriot agents conspired to circumvent the extradition procedures by fabricating his signature on a document purporting to be waiver of extradition procedures. These allegations, however, establish only that Vega was tricked or removed from Cyprus to the United States against his will, outside of the formal extradition procedure, in other words, that he was not "extradited" to the United States. No provision of the treaty between the United States and Cyprus expressly prohibits this unconventional method of transferring custody. Even if defendant was "abducted," and not merely tricked, as he alleges, his allegations place him squarely within the circumstances outlined by the Supreme Court in Alvarez-Machain. See United States v. Torres-Gonzales, 240 F.3d 14, 17 (1st Cir. 2001) (applying Alvarez-Machain where Venezuelan authorities cooperated in defendant's apprehension and voluntarily surrendered him without using extradition procedures).

There is an exception to the Ker-Frisbie doctrine where the method by which a criminal defendant is brought before a court is so egregious as to constitute a "complex of shocking governmental conduct sufficient to convert an abduction which is simply illegal into one which

sinks to a violation of due process." United States ex rel. Lujan v. Gengler, 510 F.2d 62, 66 (2d

Cir. 1975). To prevail on a challenge that a defendant's removal deprived him of his due process

rights, however, the "shocking" conduct must rise to an extreme degree of violence or offensive

conduct, such as "torture, brutality and similar outrageous conduct." See United States v.

Herbert, 313 F. Supp. 2d 324, 331 (S.D.N.Y. 2004) (quoting Lujan, 510 F.2d at 65).

Defendant's allegations of fraud and/or subtle coercion by Cypriot and United States authorities

fall substantially short of this high burden. Because any motion to dismiss Vega's indictment

based on lack of jurisdiction would have been meritless, counsel's failure to pursue this claim

cannot constitute ineffective assistance.

     B. The Rule of Speciality

     Vega also alleges that his indictment in the Eastern District of New York violates the

"rule of speciality" in the extradition treaty between Cyprus and the United States. Generally, a

rule of speciality in an extradition treaty requires that a defendant's prosecution in the requesting

country be based on the same charges for which he was extradited by the requested country. The

applicable rule of speciality in this case is set forth in Article 16 of the extradition treaty between

the United States and Cyprus: "A person extradited under this Treaty may not be . . . tried . . . in

the Requesting State except for . . . (a) the offense for which extradition has been granted or a

differently denominated offense based on the same facts on which extradition was granted,

provided such offense is extraditable or is a lesser included offense." See Gov't Ex. 12, Art. 16.

Vega argues that his indictment before this court for charges of conspiracy to commit access

device fraud and money laundering conspiracy violates Article 16 of the extradition treaty

because he was extradited to the Northern District of California for only the 40 individual counts

of credit card fraud for which he was indicted in that district, not for the instant conspiracy

charges. The government responds that Vega lacks standing to dismiss an indictment based on a violation of the rule of speciality, and that in any event, the charges against Vega in this court do not violate the rule because they are substantially related to crimes for which he was transferred to the Northern District of California. Because I find that even if he had standing, [7] Vega cannot assert a violation of the rule of speciality because he was not formally extradited pursuant to the treaty, a motion to dismiss his indictment on this ground would have been meritless.

When a criminal defendant waives extradition, or when the requested country voluntarily transfers a defendant to the requesting country without following the formal procedures of the treaty, the defendant has not been "extradited" under that treaty. See Herbert, 313 F.Supp.2d at 330 (finding that, notwithstanding an extradition request, defendant was not "extradited" pursuant to treaty where he was actually voluntarily transferred by the requested country). Moreover, where a defendant is not transferred pursuant to an extradition treaty, he cannot assert any rights conferred by the treaty. Thus, a criminal defendant's surrender to United States jurisdiction or a requested country's voluntary transfer of a defendant's custody forecloses a rule of speciality defense. See e.g., United States v. DiTommaso, 817 F.2d 201, 212 (2d Cir. 1987) (finding that the doctrine of speciality does not apply where defendant waived extradition and therefore was not actually extradited); United States v. Vreeken, 603 F. Supp. 715, 721 (D. Utah 1984), aff'd, 803 F.2d 1085 (10th Cir. 1986) (holding that waiver of extradition forecloses a speciality challenge and refusing to "inquire" into the voluntariness of the foreign waiver); Herbert, 313 F. Supp. 2d at 328-330 (defendant could not raise any violations of an extradition treaty where he was voluntarily transferred without reliance on the specific, formal procedures required by the extradition treaty). In Herbert, United States DEA agents secured the

[7] The issue of whether a criminal defendant, without the intervention of the requested country, has standing to raise a claim that his subsequent prosecution violates the rule of speciality has created both a circuit split and a split among courts in this circuit. See Antwi v. United States, 349 F.Supp.2d 663, 670 (S.D.N.Y. 2004) (collecting cases).

defendant's custody by notifying Belizian authorities that the accused had voluntarily waived his extradition treaty rights and had agreed to be transferred to the United States. Herbert, 311 F.Supp.2d at 327. The defendant denied that he had waived extradition, arguing that the United States agents deceived the Belizian officials by leading them to believe he had waived extradition, and therefore that his extradition was unlawful. The court determined that it need not resolve the issue of whether United States agents had tricked Belizian authorities because, even crediting the defendant's account, he had been turned over voluntarily by Belizian authorities without regard to proper treaty procedures. Id. at 327 n. 1. Because the defendant had not been extradited pursuant to the treaty, he could not claim any rights under it, regardless of the deceptive circumstances of his transfer of custody. Id. at 329. Similarly, because Vega was not transferred pursuant to the United States-Cyprus extradition treaty—but voluntarily by Cyprus, either by Vega's waiver of extradition or by the forgery for which United States and Cypriot authorities were allegedly responsible—he cannot invoke the rule of speciality provided in that treaty.[8]

*3. Objective Reasonableness*

In any event, defendant cannot establish that his trial counsel's performance "fell below an objective standard of reasonableness according to prevailing professional norms" by virtue of his failure to investigate the noted challenges regarding the Fourth Amendment and the extradition treaty. Arteca, 411 F.3d at 320. Even if defense counsel's investigation was less than complete—and there is no basis to believe that it was—there are no facts suggesting that further investigation was necessary for counsel to responsibly advise Vega to agree to plead guilty.

[8] Put another way, if Vega voluntarily waived his rights under the extradition treaty, he necessarily waived his challenge to extradition based on the rule of speciality. On the other hand, if Vega was transferred to the United States by some means other than pursuant to the procedures set forth in the extradition treaty, he is foreclosed from invoking the terms of the treaty, including the rule of speciality.

Vega agreed to plead guilty pursuant to a cooperation agreement with the government, a disposition that often leads to a more lenient sentence if the defendant provides substantial assistance to the government and otherwise complies with the agreement. See U.S.S.G. § 5K1.1 (permitting court to depart downward in sentencing upon motion of the government stating that defendant "has provided substantial assistance"). On the record before the court, because any further efforts by counsel to suppress evidence or dismiss the indictment were doomed to fail, it was not objectively unreasonable for counsel to advise Vega to enter a guilty plea, avoid trial, and potentially receive a more favorable sentence.

   4. *Defendant's Statements During Allocution*

   Finally, in ruling on whether Vega's counsel was ineffective, the court is entitled to rely on Vega's sworn statements at his plea allocution. At the time, Vega unambiguously affirmed that he had been fully able to communicate with his attorney, he and his attorney had time to discuss his case, he was satisfied with his attorney's representation, and his guilty plea was entered knowingly and voluntarily. See United States v. March, 382 Fed. App'x. 76, 78 (2d Cir. 2010) (affirming rejection of motion to withdraw plea where defendant "affirmed under oath the adequacy of his former counsel's representation, and stated that he was satisfied and had sufficient time to discuss the charges and his decision to plead guilty"). At the close of the allocution, I had no reason to doubt that defendant's plea was voluntary, knowing and intelligent and that counsel's representation of Vega had been wholly satisfactory. The strength of that allocution even further undermines Vega's suggestion that his counsel was ineffective.

b. **Voluntariness and Intelligence of the Guilty Plea**

   Construing Vega's various challenges liberally, he also contends that his guilty plea was involuntary and unknowing because his lack of proficiency in the English language at the time

prevented him from understanding the proceedings before him. The record plainly contradicts Vega's claim. During the allocution, defendant unambiguously articulated that he understood English "perfectly," was facile in communicating in the English language apart from occasional lapses in grammar, fully understood the proceedings before him, and did not desire the services of an interpreter. Consistent with his assurances, Vega answered all of my questions clearly, and with a responsiveness and level of detail that demonstrated an obvious understanding of each issue addressed. His recent claim that his limited English language skills rendered his guilty plea involuntary or unknowing is wholly meritless.

Vega's claims that his deteriorating health and the punitive conditions of his confinement rendered his guilty plea involuntary are similarly frivolous. As to the conditions of his confinement, Vega cites only his lawful incarceration at the Metropolitan Detention Center in Brooklyn as inducing his involuntary plea. Vega's unextraordinary detention does not undermine my previous finding that his guilty plea was entered knowingly and voluntarily. Nor do the head and dental injuries he allegedly sustained on August 28, 2007 as a result of fainting spell during his transfer to a San Francisco courthouse render involuntary his subsequent guilty plea in this court.[9] His conclusory assertion of physical incapacity raised more than two years after his 2009 guilty plea is squarely at odds with his active involvement in this case and the consistent cogency of his interactions with me over an extended period of time.

Any allegations of coercion or lack of voluntariness are also contradicted by Vega's statements during his plea allocution:

> The Court: Are you making the pleas voluntarily and of your own free will?
> The Defendant: Yes.
> The Court: Okay. Has anyone threatened, forced or coerced you in any way to

[9] Vega contends, for the first time in his reply, that his head injuries rendered him unable to "think clearly or even think at all," and that this "caused him mental incompetency, which in turn forced defendant to cede full decision-making duties to counsel."

plead guilty?
The Defendant: No

Tr. at 20-21. Statements made at plea allocutions "'carry a strong presumption of verity' . . . and are generally treated as conclusive in the face of the defendant's later attempt to contradict them." Adames v. United States, 171 F.3d 728, 732 (2d Cir. 1999) (quoting Blackledge v. Allison, 431 U.S. 63, 73-74 (1977)). Based on extensive interactions with Vega, I was persuaded that he had a firm understanding of the charges before him and that his plea was voluntary. In my judgment, the defendant appeared rational and intelligent. Defendant has therefore failed to provide any reason justifying the withdrawal of his knowing and voluntary entry of a plea of guilty.

c. **Consideration of the Factors for Withdrawing Guilty Plea**

Finally, all three of the factors identified by the Court of Appeals as important considerations in a motion to withdraw a guilty—that is, length of delay in seeking relief, an assertion of legal innocence, and prejudice to the government—militate against permitting Vega to withdraw his guilty plea.

*1. Length of Delay*

Vega pleaded guilty before this court on January 26, 2009, and did not move to withdraw his plea until April 5, 2011. The extreme twenty-six month delay between the plea and motion does not reflect a "swift change of heart . . . indicat[ing] that the plea was entered in haste or confusion." Rule 32, Advisory Committee Notes, 1983 Amendments. The only factual bases underlying defendant's motion—the circumstances of the seizure of the laptop, his extradition from Cyprus, and his alleged injuries—were known to him at the time he entered his guilty plea.[10] Vega's considerable delay therefore weighs heavily against permitting him to now

[10] Indeed, before entering a guilty plea for related charges in the Northern District of California, defendant, in

withdraw his guilty plea. See United States v. (Efrain) Gonzalez, 647 F.3d 41, 55 (2d Cir. 2011) (affirming district court denial of motion to withdraw plea where there was a seven-month delay between the guilty plea and the motion to withdraw); United States v. Doe, 537 F.3d 201, 213 (2d Cir. 2008) (holding that the "fact that the defendant waited five months to file his motion strongly supports the district court's finding that his plea was entered voluntary" and denying motion to withdraw the plea); United States v. Torres, 129 F.3d 710, 716 (2d Cir. 1997) (affirming district court's denial of motion to withdraw plea without a hearing where defendant's plea allocution was clear and there was an "extreme delay" of fifteen months before the filing of a motion); United States v. Curtis, 08 Cr. 183 (LAP), 2010 U.S. Dist. LEXIS 51255, at * 23-24 (S.D.N.Y. May 19, 2010) (seven-month delay between plea and motion weighs against granting motion); United States v. Carraballo, No. 98 Cr. 1316, 2001 U.S. Dist. LEXIS 1121, at *14 (S.D.N.Y. Feb. 13, 2001) (finding the passage of seven weeks between the plea and the motion to withdraw to weigh against permitting withdrawal).

2. *Assertion of Legal Innocence*

Moreover, while Vega argues in his papers that he is "actually innocent" of the charges in the indictment to which he pleaded guilty, he offers no factual or legal basis for this assertion. United States v. Davis, 48 F. App'x 809, 811 (2d Cir. 2002) ("[A] claim of innocence is not a basis for withdrawing a guilty plea unless supported by evidence."). Vega's only claims in this regard go to whether his counsel should have pursued motions to suppress evidence or dismiss the indictment, both of which I have already found utterly meritless. United States v. Desrosier, 431 Fed. Appx. 36, 37 (2d Cir. 2011) ("As to [the] second factor, Desrosier did not assert a claim of legal innocence, as he relied primarily on his desire to file suppression motions, which the

---

September of 2005, filed a motion a dismiss the indictment on substantially similar grounds before abandoning the challenges and pleading guilty.

district court found meritless."); United States v. Hudak, 02-Cr-853(JFK), 2003 WL 22170606, at * 3 (S.D.N.Y. Sept. 19, 2003) (rejecting defendant's attempt to withdraw his plea to attack the validity of a search warrant and noting that "[t]he purpose of considering legal innocence is to insure that the defendant's reason for withdrawing the plea is 'just' and not simply a recalculation of his chances of defeating the indictment"). Apart from that, Vega's present claim that he is "actually innocent" amounts to no more than a "bald statement[] that simply contradict[s] what he said at his plea allocution, [which is] not sufficient ground[] to withdraw the guilty plea." United States v. Hirsch, 239 F. 3d 221, 225 (2d Cir. 2001). Accordingly, this factor also weighs heavily against permitting defendant to withdraw his plea.

3. *Prejudice to the Government*

Where the defendant has not provided a sufficient reason justifying withdrawal of his guilty plea, the government need not demonstrate prejudice. See United States v. Hyde, 520 U.S. 670, 676-77 (1997) ("Given the great care with which pleas are taken under [the] revised Rule 11, there is no reason to view pleas so taken as merely 'tentative,' subject to withdrawal before sentence whenever the government cannot establish prejudice.") (quoting Rule 32, Advisory Committee Notes, 1983 Amendments); United States v. (Efrain) Gonzalez, 647 F.3d 41, 56 (2d Cir. 2011) ("There is no burden on the government to show that it would be prejudiced by the withdrawal of the guilty plea unless the defendant has shown sufficient grounds to justify withdrawal."). In any event, the government argues persuasively that witnesses' memories may fade due to the passage of so long a period of time. While not independently determinative, the court finds that the government has demonstrated a showing of prejudice given the extreme passage of time in this case. See (Efrain) Gonzales, 647 F.3d at 55-57 (approving of district court finding of prejudice because of risk of fading memories after

seven-month delay). Each relevant factor therefore weighs against granting defendant's motion.

## III. CONCLUSION

For the reasons set forth above, defendant's motion to withdraw his guilty plea pursuant to Rule 11(d)(2)(B) is denied because he has not shown a fair and just reason for withdrawal. Because defendant has failed to present any significant question concerning the voluntariness or validity of the plea, no evidentiary hearing is warranted.

SO ORDERED.

/s/
Allyne R. Ross
United States District Judge

Dated: May 24, 2012
Brooklyn, New York

SERVICE LIST:

**Plaintiff:**

Roman Vega
# 59198-004
MDC Brooklyn
Metropolitan Detention Center
P.O. Box 329002
Brooklyn, NY 11232