# DEBEVOISE & PLIMPTON LLP

919 Third Avenue
New York, NY 10022
Tel 212 909 6000
www.debevoise.com

Matthew E. Fishbein
Partner
Tel 212 909 6077
Fax 212 521 7077
mfishbein@debevoise.com

July 15, 2013

BY FEDERAL EXPRESS

The Honorable Allyne R. Ross
United States District Court
225 Cadman Plaza East
Brooklyn, NY 11201

### United States v. Roman Vega, No. 07-CR-707 (ARR)

Dear Judge Ross:

We write regarding our client, Roman Vega, whose case will be ready for sentencing upon full submission of the parties' sentencing memoranda. On January 26, 2009, pursuant to a plea agreement with the Government, Mr. Vega pled guilty to conspiracy to commit access device fraud for conduct over a four-month period from October 2002 through February 2003, in violation of 18 U.S.C. §§ 1029(b)(2), 1029(a)(5) and 1029(c)(1)(A)(ii), and conspiracy to commit money laundering over the same four month period in violation of 18 U.S.C. §§ 1956(h) and 1956(a)(1)(A)(i).

Although the Government has offered no proof that Mr. Vega's conduct caused any pecuniary loss to anyone, the operation of the Federal Sentencing Guidelines (the "Guidelines") in Mr. Vega's case results in a Guideline offense level of 46, three levels higher than the highest offense level included in the sentencing table. This offense level would ordinarily result in a term of life imprisonment but for the fact that the statutory maximum for the two counts to which Mr. Vega pled is 330 months (27.5 years). This offense level and the resulting term of 330 months' imprisonment are completely out of line with sentences imposed on similarly situated defendants and far greater than necessary to achieve the goals of sentencing.

Mr. Vega has been incarcerated since his initial arrest in Cyprus in February 2003. He has now served more than nine years in federal custody without being sentenced. More than half of that time has been served at the Metropolitan Detention Center ("MDC") in Brooklyn, where Mr. Vega has been housed in conditions far more severe than those in a typical federal correctional institution, with minimal access to the

types of educational and training programs and recreational facilities available at such institutions.

We respectfully submit that the disproportionate impact of the Sentencing Guidelines, Mr. Vega's prolonged detention at the MDC, and the additional factors of Mr. Vega's personal history support a sentence of time served—nine plus years and counting.

I.      **Personal History**

Mr. Vega was born on October 23, 1964 in Ukraine, then part of the Soviet Union.  His parents divorced when he was seven years old, and after the divorce, he was raised solely by his mother, who had limited means.  Mr. Vega graduated from high school in Chernigov, Ukraine, in 1982 and was awarded a gold medal, the country's highest high school achievement award, given only to students who achieved a perfect score on all final examinations.  After high school, Mr. Vega joined the Soviet army and worked as a communications specialist in the intelligence division, rising to the rank of sergeant.   He was deployed to Afghanistan, where he was responsible for communications for various missions in the combat zones in Kabul, Mazar-al-Sharif and Kandahar, and to Kazakhstan, where he was in charge of communications for an anti-missile defenses regiment of 3,000 soldiers.  Mr. Vega earned several decorations for his service in both regions.

After Mr. Vega was discharged from the military in 1985, he studied mathematics for five years at Simferopol State University in Simferopol, Ukraine, earning the equivalent of a Master's degree.  After completing university, Mr. Vega served in the Crimean Mountain Emergency Service (Контрольно-спасательная служба) in Ukraine, as a rescue worker for tourists and others who were endangered in the mountains.  Mr. Vega used the radio skills that he had developed in the military to help establish communications between rescue groups for hundreds of missions, and also participated directly in rescue operations.

In 1989, Mr. Vega traveled to Vietnam and joined "CUU LONG," a Soviet-Vietnamese joint venture enterprise for the operation and private use of the Amateur Radio Station in Ho Chi Minh City.[1]  For the next two years, he conducted general radio-communications and emergency-communications classes for Vietnamese government personnel and military officials, including the Vietnamese Navy.  These classes laid the

_____

[1]      *See* Ex. 1, CUU LONG Certificate and Radio License (Dec. 21, 1989).

Hon. Allyne R. Ross                              3                              July 15, 2013

foundation for the establishment of the Vietnamese Amateur Radio Club, which still exists today.[2]

Mr. Vega has long had an interest in and been active with amateur radio activities ("DXing"), using radio communications skills that he learned from his father and in the military.[3]  He has received numerous awards from the International DX Association, a non-profit organization for the enhancement of amateur radio, for his support and work enhancing amateur radio and fellowship worldwide.[4]  Mr. Vega has often used his amateur radio skills to assist in military or rescue operations.  In addition to his work with the Crimean Mountain Emergency Service, in 1991, Mr. Vega helped to evacuate an entire village before an avalanche during an earthquake in Oni, Georgia and also participated in several rescue operations in the Caucasus mountain range.

Mr. Vega was an active participant in the pro-democracy movement in the Soviet Union in the late 1980's.  He helped found Memorial, a group dedicated to recording and publicizing the Soviet Union's totalitarian past and monitoring human rights issues in Russia and other post-Soviet states.  Mr. Vega was elected to serve as a delegate to the inaugural Memorial conference in Moscow; other participants included Nobel Peace Prize winner Andrei Sakharov and Elena Bonner.[5]

In 1991, when a group of Communist Party members attempted to seize control of the government from democratically elected President Boris Yeltsin, Mr. Vega delivered and set up radio equipment, enabling President Yeltsin to issue decrees from Parliament

---

[2]   *See* Vietnamese Amateur Radio Club, http://varc.radioclub.asia/.

[3]   "DXing" is the practice of receiving and identifying distant radio signals, or making two way radio contact with distant stations in amateur radio, citizens' band radio, or other two way radio communications. *See, e.g.*, DXing, Wikipedia, http://en.wikipedia.org/wiki/DXing.  Many "DXers" also attempt to obtain written verifications of reception or contact, sometimes referred to as "OSLs" with other DXers.

[4]   *See* Ex. 2, International DX Association Certificate Presented To Romeo 3W3RR. Mr. Vega's call name is Romeo 3W3RR.

[5]   *See* Ex. 3, Picture of Roman Vega and Elena Bonner at Memorial Founding Conference at Moscow Aviation Institute (January 1989).

Hon. Allyne R. Ross                        4                        July 15, 2013

across the country,[6] and enabling the detained members of Parliament to communicate with the outside world through ham-radio operators.[7]

During the 1990s, in response to the widespread fighting and lawlessness in Eastern Europe that followed the collapse of Communism, Mr. Vega, along with others, helped found an organization in Ukraine to defend businesses against corruption in Ukraine.[8]

Beginning in 1993, Mr. Vega established a business providing surveillance, counter-surveillance, high-tech intelligence, communication, and anti-terrorism equipment and solutions for various international state agencies & governments. The business eventually operated out of a number of countries, including two companies in the United States, Equity USA, Inc. and SpyWorld Net, Inc.[9]

From 2000–2003, Mr. Vega owned and operated Elcom Electronics FZE (Free Zone Enterprise), a privately held import/export company, in the Ajman Free Zone in the United Arab Emirates (UAE). Mr. Vega's primary work for Elcom involved exporting consumer electronics from Singapore, through the UAE, to post-Soviet republics. During that time, Mr. Vega split his time living in Ukraine, Malta, and the UAE. Mr. Vega also

---

[6]   For example, at the White House (Russia's Parliament building), President Yeltsin issued a declaration in which it was stated that a reactionary anti-constitutional coup had taken place and urged the military not to take part in the coup. The declaration called for a general strike with the demand to let Mikhail Gorbachev address the people. This declaration was distributed around Moscow. *See, e.g.*, http://en.wikipedia.org/wiki/1991_Soviet_coup_d%27%C3%A9tat_attempt.

[7]   *See* Ex. 4, Soviet Hams Rally Against Coup, QST (Nov. 1991); Ex. 5, National Society of the Sons of the American Revolution Certificate (May 19, 1992).

[8]   *See* Ex. 6, Business and Personal Security Foundation Certificate of Incorporation 1–2 (June 21, 1994) (Certified English translation included as Exhibit 7); Ex. 8, Business and Personal Security Foundation Organization By-Laws (July 7, 1994) (Certified English translation included as Exhibit 9).

[9]   According to the PSR, these companies were the target of a government investigation related to the alleged export of polygraph equipment. Mr. Vega was charged with conspiracy to export polygraph devices without the approval of the United States Department of Commerce, but these charges were ultimately dismissed. *See* PSR ¶¶ 66–69.

operated a high-tech health equipment company in Ukraine called Qwerks until his arrest in 2003.  Qwerks produced and sold communication and eco-related equipment, such as ionizers, as well as scientific measuring equipment.

## II.   **Family**

Although Mr. Vega's parents divorced when he was young, he is still close with both of them.  Mr. Vega's father, Vladimir Stepanenko, 74, is retired and living in Chernigov, Ukraine.  Mr. Vega credits his early interest in ham radio to his father.  Mr. Vega's mother, Nadia Tsybula, 74, lives in Simferopol, Ukraine.  Mr. Vega is one of the only sources of support for his two parents, who both have age-related health problems. *See* PSR ¶ 106.  When released, he intends to continue to assist them.

Mr. Vega married his first wife, Alena Demicheva, in 1987.  Together, they had a daughter, Alexandra Stepanenko, who is 24 years old.  Ms. Stepanenko currently attends Duke University in North Carolina, where she is majoring in psychology.  Despite their separation, she maintains a close relationship with her father, who sends her mail "almost every day."  Alexandra laments that her father "has missed me grow up," but stresses that he "has managed to contribute more to my development than the freely-able parents of many of my peers."  As she explains:

> I get books, magazines, articles, newspaper clippings and countless letters, all about the interests I have shared with him – but more importantly, about the steps beyond them. If I say that I am learning Japanese, he learns Japanese faster than I, and sends me flashcards.  If I say I am exploring philosophy, he sends me thoughtfully selected texts with helpful notes and highlights.  There is no other person as enthusiastically, holistically involved in the passions that make me who I am.  I would have certainly not been me without all of my dad's intellectual encouragement in my teenage years, nor without his early influence on my childhood.[10]

Alexandra concludes by noting that "a pile of paper-filled boxes is, in this case, a poor substitute for a father.  I miss him in all the senses of the word."[11]  Mr. Vega's ex-wife,

---

[10]   Ex. 10, Letter from Alexandra Stepanenko (Apr. 16, 2011).

[11]   *Id.*

Ms. Demicheva, confirms that Mr. Vega is "a very good person, reliable, and a very good father." PSR ¶ 75.

In 2000, Mr. Vega married Galyna Vasylkivska, with whom he still remains in contact. Together they had a son, Stepan Stepanenko, who is twelve-years old and lives with his mother in Ukraine. Mr. Vega has been separated from Stepan since his son was 2 years old. Stepan suffers from phenylketonuria (PKU), an inherited disorder that increases the levels of a substance called phenylalanine in the blood to a dangerous level; if untreated, it can result in damage to the central nervous system, including brain damage. PKU is treatable by a diet that is extremely low in phenylalanine, particularly when the child is growing. The diet must be strictly followed and requires close supervision by a registered dietitian or doctor, and cooperation of the parent and child.[12] As indicated by a medical certificate from one of Stepan's doctors, Dr. Mario Cilia of Mosta, Malta, Stepan "will need constant medical monitoring and accurate diet control by his parents."[13] Mr. Vega laments not being there to care for his son during his earlier years and hopes to make up for the lost time together upon his release.

III.    **Mr. Vega's Arrest and Subsequent Case History**

Mr. Vega was arrested on credit card fraud charges in Nicosia, Cyprus on February 26, 2003. The indictment charged Mr. Vega with conspiracy to commit a felony, credit card forgery, attempted robbery, and possession of a plate or instrument for the creation of a seal. *See* PSR ¶ 58. According to Mr. Vega, he was not given a trial, but the judge merely imposed a sentence for those charges. Mr. Vega was sentenced to up to 18 months' imprisonment in Cyprus, where he remained in jail until May 6, 2004. On the date of his release, Mr. Vega was detained in Cyprus pursuant to a provisional arrest warrant initiated by the United States Attorney for the Northern District of California, which charged him with wire fraud and access device fraud. On June 3, 2004, Mr. Vega was extradited to the Northern District of California and arraigned on the indictment. On November 9, 2006, Mr. Vega pled guilty to twenty counts of fraud relating to twenty illegal credit card transactions that were approved through Visa's Operation Center in San Mateo, CA.

---

[12]    *See, e.g.*, Phenylketonuria, Pub Med Health,
        http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002150/.

[13]    Ex. 11, Medical Certificate for Stepan Stepanenko (Oct. 3, 2003).

Case 1:07-cr-00707-ARR   Document 101   Filed 07/15/13   Page 7 of 24 PageID #: 720

On September 18, 2007, a grand jury in the Eastern District of New York returned a two-count indictment against Mr. Vega, charging him with conspiracy to commit access device fraud, under 18 U.S.C. § 1029, and conspiracy to commit money laundering, under 18 U.S.C. § 1956(h).  Mr. Vega was transferred and arraigned in the Eastern District of New York on November 9, 2007.[14]

On January 26, 2009, Mr. Vega pled guilty to the charges against him in the Eastern District of New York, pursuant to an agreement with the government, to one charge of Conspiracy to Commit Access Device Fraud, under 18 U.S.C. § 1029, and one charge of Conspiracy to Commit Money Laundering, under 18 U.S.C. § 1956(h), for conduct between October 2002 and February 2003.  On April 5, 2011, Mr. Vega filed a motion to withdraw his guilty plea, primarily on the ground that his former counsel had been ineffective in advising him to enter the plea.  On May 24, 2012, by written order and opinion, the Court denied Mr. Vega's motion.

IV.     **Mr. Vega's Offense Level Calculation of 46**

The U.S. Probation Department ("U.S. Probation") filed a Presentence Investigation Report (the "PSR") on July 19, 2012 and filed an Addendum to the Presentence Report on January 16, 2013.  The total offense level calculated for Mr. Vega's conduct is 46—an offense level that exceeds the highest offense level on the Federal Sentencing Table, and for which the Guideline imprisonment term is life.[15] However, since the maximum term of imprisonment applicable to Mr. Vega's conduct for conspiracy to commit access device fraud is 7.5 years, *see* 18 U.S.C. §§ 1029(b)(2) and (c)(1)(A)(ii), and the maximum term of imprisonment applicable here for conspiracy to commit money laundering is 20 years, *see* 18 U.S.C. § 1956(a)(1), the statutory maximum that Mr. Vega can receive is 27.5 years, or 330 months; thus, the Guideline range recommended in the PSR is this maximum, 330 months.  *See* PSR ¶¶ 107–08; Addendum to the PSR ¶ 108.

---

[14]   Mr. Vega was transferred to the Eastern District of New York prior to his sentencing in the Northern District of California.  Accordingly, after his sentencing in the Eastern District of New York, he will face sentencing on the charges in California. *See* PSR ¶ 62.

[15]   The PSR originally set Mr. Vega's offense level at 50, but after resolution of the Government's and Mr. Vega's objections to the PSR, the offense level was reduced by four points.  The reduction did not alter the 330 months' sentencing recommendation of the Probation Department. *See* Addendum to the PSR ¶ 108.

Hon. Allyne R. Ross                    8                    July 15, 2013

A.    **Conspiracy to Commit Access Device Fraud, 18 U.S.C. § 1029**

The base offense level for conspiracy to commit access device fraud is 6. *See* U.S. Sentencing Guidelines Manual § 2B1.1(a)(2). Although the Government has offered no proof of any actual losses arising from the use of the misappropriated credit card numbers, the PSR adds 28 levels to this base level to account for the "intended loss" for Mr. Vega's conduct. This amount of loss is based neither on Mr. Vega's actual intent, nor the amount of loss actually incurred by Mr. Vega's actions, but rather on Application Note 3(F)(i) to Guideline § 2B1.1, which provides:

> (i) <u>Stolen or Counterfeit Credit Cards and Access Devices;</u> <u>Purloined Numbers and Codes</u>. In a case involving any counterfeit access device or unauthorized access device, loss includes any unauthorized charges made with the counterfeit access device or unauthorized access device and *shall be not less than $500 per access device*. . . . For purposes of this subdivision, "counterfeit access device" and "unauthorized access device" have the meaning given those terms in Application Note 9(A). (emphasis added)

The PSR applies this presumption to reach a "conservatively estimated" $250,000,000 intended loss for Mr. Vega's conduct.[16]

In addition, the PSR makes the following adjustments to Mr. Vega's offense level, many of which overlap and thus double penalize Mr. Vega for the same underlying conduct:

- The defendant was in the business of receiving and selling stolen property: 2 levels are added, per U.S. Sentencing Guidelines Manual § 2B1.1(b)(4);

---

[16] *See* PSR ¶ 24 ("According to the case agent, investigators identified more than 500,000 unique credit card numbers. Due to the immense volume of data stored on the laptop, the use of encrypted containers, and the presence of card data in e-mails, archives, text documents, and chat logs, an exact figure for use in loss calculations cannot be provided to the Court. Therefore, the defendant is held accountable for a conservatively estimated $250,000,000 in intended loss (500,000 access devices x $500 per device). *See* Application Note (f)(i) to Guideline 2B1.1.").

Hon. Allyne R. Ross                          9                          July 15, 2013

- The defendant relocated the fraudulent scheme to another jurisdiction to evade law enforcement. Additionally, a substantial part of the scheme was committed from outside the United States, and the offense involved sophisticated means: 2-levels are added, per U.S. Sentencing Guidelines Manual § 2B1.1(b)(9);

- The offense involved the possession and use of device-making equipment, as well as the trafficking of unauthorized access devices: 2 levels are added, per U.S. Sentencing Guidelines Manual § 2B1.1(b)(10);

- The defendant was an organizer and leader of a criminal activity that involved five or more participants, and was otherwise extensive: 4 levels are added, per U.S. Sentencing Guidelines Manual § 3B1.1(a).

Thus, Mr. Vega's total offense level for conspiracy to commit access device fraud is 44.[17]

**B.    Conspiracy to Commit Money Laundering, 18 U.S.C. § 1956(h)**

The Guideline for conspiracy to commit money laundering under 18 U.S.C. § 1956(h) is § 2S1.1(a)(1), which provides for the application of the offense level for the underlying offense from which the laundered funds were derived. Thus, the offense level for this count is largely based off of Mr. Vega's offense level for conspiracy to commit access device fraud, and adds two levels for a conviction under 18 U.S.C. § 1956. *See* U.S.S.G. § 2S1.1(b)(2)(B). This results in an offense level of 46 for conspiracy to commit money laundering, as well as a total offense level, after grouping, of 46, pursuant to U.S.S.G. § 3D1.2(d).

---

[17] In the initial PSR, Mr. Vega's calculated total offense level for this count was 50, including an additional 6 levels because "the offense involved 250 or more victims." After defense counsel pointed out that "victim" is defined as any person who sustained an *actual* loss, the Probation Department submitted an Addendum to the PSR eliminating this enhancement because there is no evidence that any victim suffered an actual loss. *See* Addendum to PSR at 2. The PSR also originally credited Mr. Vega with 2 points for acceptance of responsibility, but on the Government's Objection, this reduction was removed. *See* Addendum to PSR at 1–4.

Hon. Allyne R. Ross                    10                        July 15, 2013

V.    **A Sentence of Time Served for Mr. Vega Is Sufficient, but Not Greater Than Necessary to Serve the Objectives of Sentencing**

As Your Honor well knows, the Guidelines are advisory, not mandatory, *see United States v. Booker*, 543 U.S. 220, 261–63 (2005), and any sentence must be determined on the basis of the wide range of factors listed in 18 U.S.C. § 3553(a). Indeed, the Guideline range is only one factor to be considered by the Court in determining the appropriate sentence, and the Court may determine "that in the particular case a within Guidelines sentence is greater than necessary to serve the objectives of sentencing." *Kimbrough v. United States*, 552 U.S. 85, 91 (2007) (citing 18 U.S.C. § 3553(a)). Thus, the Court must also conduct an independent review of the sentencing factors outlined in 18 U.S.C. § 3553(a) and impose a sentence that is "sufficient, but not greater than necessary," taking into account the four purposes of incarceration: retribution, deterrence, incapacitation, and rehabilitation.

Where, as here, the Guidelines level is completely out of line with sentences imposed on similarly situated defendants, the § 3553(a) inquiry takes on particular importance. We submit that a number of factors justify a sentence of time served for Mr. Vega: (1) Mr. Vega's offense level calculation and Guidelines-recommended sentence are severely inflated by the loss amount at issue and would result in a sentence substantially greater than those typically meted out in comparable cases; (2) overlapping enhancements that account for only minimally different aspects of the same conduct result in a higher offense level computation for Mr. Vega than is justified; (3) Mr. Vega's personal history and the unique circumstances of this case warrant a downward adjustment; and (4) Mr. Vega has already served nine years in pre-sentence incarceration facilities without access to the programs and resources that would be available to him at a typical long-term federal correctional institution

A.    **Mr. Vega's Calculated Offense Level Overstates the Seriousness of the Offense**

1.    *The Guidelines' Offense Level Calculations Place an Inordinate Emphasis on Loss Amount that Overstates the Seriousness of Mr. Vega's Offense*

Mr. Vega's calculated offense level of 46 is literally "off the charts" on the Federal Sentencing Table, exceeding the highest level of 43, which calls for a sentence of life imprisonment. Mr. Vega's calculated offense level and the resulting 330-month statutory maximum sentence highlight a phenomenon that has been recognized by many

courts—the "patently absurd"[18] results that Guidelines calculations may yield in certain situations, particularly in the case of certain white collar crimes, such as fraud and money laundering, where the Guidelines place an inordinate emphasis on the loss amount.[19]  In fraud cases, the Guidelines treat loss as "a principal factor in determining the offense level" because, they claim, loss "serves as a measure of the seriousness of the offense and the defendant's relative culpability."  U.S.S.G. § 2B1.1, cmt. background.  While the relationship between loss amount and level of culpability may be appropriate in some cases it is often disproportionate, exaggerating the seriousness of the offense and/or the defendant's culpability.[20]

---

[18]  *See United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006), *aff'd* 301 F. App'x 93, at *1 (2d Cir. 2008); *see also United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006) ("Twenty-five years is a long sentence for a white collar crime, longer than the sentences routinely imposed by many states for violent crimes, including murder, or other serious crimes such as serial child molestation."); *Parris*, 573 F. Supp. 2d at 751.

[19]  *See Adelson*, 441 F. Supp. 2d at 509; *see also Ebbers*, 458 F.3d at 129 (noting that due to the loss amount enhancement in many fraud cases, "[u]nder the Guidelines, it may well be that all but the most trivial frauds in publicly traded companies may trigger sentences amounting to life imprisonment"); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427–28 (S.D.N.Y. 2004) ("The Guidelines place undue weight on the amount of loss involved in the fraud"); *see also United States v. Gupta*, No. 11 CR 907, 2012 WL 5246919, at *1 (S.D.N.Y. Oct. 24, 2012) ("The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense.").

[20]  Courts have recognized that the specific amount of loss is often a "kind of accident" and thus a relatively weak indicator of a crime's seriousness or the need for deterrence, because most defendants do not set out to defraud a specific amount of money; rather, the amount of loss is dependent on the point of when the ongoing fraud happens to be detected.  *See Emmenegger*, 329 F. Supp. 2d at 427–28 ("Had [the defendant] been caught sooner, he would have stolen less money; had he not been caught until later, he would surely have stolen more."); *see also United States v. Mueffelman*, 400 F. Supp. 2d 368, 373 (D. Mass. 2005) ("Loss may well be a kind of accident, depending on the fortuities of law enforcement or even the market, as much as the defendant's culpability."); *United States v. Milne*, 384 F. Supp. 2d 1309, 1312 (E.D. Wis. 2005) ("With their almost singular focus on loss amount, the guidelines sometimes are insufficiently sensitive to personal culpability.").

Hon. Allyne R. Ross                     12                          July 15, 2013

     In such circumstances, courts have not infrequently imposed below-Guidelines sentences to offset the disproportionate emphasis placed by the Guidelines on the loss amount.[21]   Indeed, as the following review of recent cases demonstrates, courts have not hesitated to impose sentences substantially below the Guidelines range in circumstances where the loss amounts were far greater than the loss amount presumed in this case.[22]

- **Sanjay Kumar, CEO, and Stephen Richards, Sr. Vice President, Computer Associates (E.D.N.Y. 2006).** Kumar and Richards each pled guilty to conspiracy to commit securities fraud and wire fraud, securities fraud, making false statements to the SEC, obstruction of justice, and other charges.  Based on a loss amount of over $400 million, their offense levels were each 50, resulting in a

---

[21]   *See* 18 U.S.C. § 3553(a); U.S.S.G. § 2B1.1 Application Note 19(C) ("There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense.  In such cases, a downward departure may be warranted."); *United States v. Adelson*, 441 F. Supp. 2d 506, 506–08 (S.D.N.Y. 2006) (imposing a 42-month sentence despite a loss amount of $260 million and an offense level of 55 because of "the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss . . . without, however, explaining why it is appropriate to accord such huge weight to such factors," and concluding that "[t]his is one of those cases in which calculations under the Sentencing Guidelines lead to a result so patently unreasonable as to require the Court to place greater emphasis on other sentencing factors to derive a sentence that comports with federal law."); *Parris*, 573 F. Supp. 2d 744, 745, 754 (E.D.N.Y. 2008) (describing "the Sentencing Guidelines for white-collar crimes" as a "black stain on common sense," and sentencing defendant facing advisory guidelines range of 360 months to life to 60 months' imprisonment); *see also United States v. de la Cruz*, 397 F. App'x 676, 678 (2d Cir. 2010) ("Appellant is correct insofar as he asserts that a Guidelines sentence can create an unwarranted disparity, a proposition supported by the Supreme Court's decision in *Kimbrough v. United States*); *United States v. Gupta*, No. 11 CR 907, 2012 WL 5246919, at *2–3 (S.D.N.Y. 2012) ("[I]n implementing the Congressional mandate, the Sentencing Commission chose to focus largely on a single factor as the basis for enhanced punishment: the amount of monetary loss or gain occasioned by the offense.  By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission . . . effectively guaranteed that many such sentences would be irrational on their face.").

[22]   We have obtained the cited sentencing transcripts, judgments, and other filings related to each of the cases discussed in this section and can provide them to the Court upon request.

23901658v13

Guidelines range of life imprisonment.[23]  In sentencing Kumar to 144 months, Judge Glasser noted that "[t]o impose [life imprisonment] in this case would shock the conscience of this Court and I dare to believe it would shock the conscience of the reasonable person."[24]  Judge Glasser also substantially departed from the Guideline range in sentencing Richards to 84 months, after taking into account the "surrounding circumstances of [his] crimes, [Richards'] role in them, [and] the environment in which they were committed."[25]

- **Ronald Ferguson, the CEO of General Reinsurance Corp. (D. Conn. 2009).**  Ferguson was convicted of conspiracy, securities fraud, false statements to the SEC and mail fraud.  Despite determining that the loss amount was $544 million, resulting in a total adjusted offense level of 49 and a Guideline range of life imprisonment, the court sentenced Ferguson to 24 months, after taking into account, among other things, the fact that the offense level substantially overstated the seriousness of the offense.[26]

---

[23]  There was a dispute at sentencing regarding which set of Guidelines applied and whether there was an *ex post facto* issue with applying the 2005 Sentencing Guidelines.  At sentencing, the district court stated that Kumar's and Richardson's Guideline ranges were life imprisonment.  *See* Kumar Sentencing Tr. 65:1–9, 65:21–23; Richards Sentencing Tr. 17:2–9.  At Kumar's sentencing, the Court further noted that "it was not Congress's aim to straight jacket a sentencing court, compelling it to impose sentences like a robot inside a guidelines glass bowl and preventing it from ex[er]cising discretion, flexibility and independent judgment."  Kumar Sentencing Tr. 66:8-11.

[24]  Kumar Sentencing Tr. 65:21–66:1

[25]  *See* Richards Sentencing Tr. 30:8–31:8; *see also* Judgment, *United States v. Richards*, No. 1:04-cr-00846 (E.D.N.Y. Nov. 22, 2006), ECF No. 283.  On appeal, the Second Circuit held that Richards should have been entitled to a two-point reduction under Guideline § 3E1.1 for acceptance of responsibility.  *United States v. Kumar*, 617 F.3d 612, 637 (2d Cir. 2010).  The Second Circuit affirmed the judgment against Richard, but vacated his sentence and remanded him for re-sentencing.  At his re-sentencing on October 14, 2010, Richards' offense level was still calculated to be 50.  *See* Richards Re-Sentencing Tr. 12:20–23.  After the Court took into account the circumstances of Richards' confinement (far from his family in New Zealand) and his good behavior during imprisonment, Richards was sentenced to time served, which amounted to roughly a 44 month sentence.  *Id.* at 24:17–25.

[26]  *See* Ruling on Loss Calculation, Victim Enhancement, and Restitution, at 15, *United States v. Ferguson*, Case No. 3:06-cr-00137 (D. Conn. Oct. 31, 2008), ECF No.

Hon. Allyne R. Ross                          14                          July 15, 2013

- **Mehdi Gabayzadeh, CEO, American Tissue (E.D.N.Y. 2006).**  Gabayzadeh was convicted of conspiracy to commit securities fraud, conspiracy to commit bank fraud, bank fraud, wire fraud, interstate transport of property obtained by fraud, bankruptcy fraud, conspiracy to commit perjury, and obstruction of justice. Despite what the Pre-Sentence Report estimated to be a "conservative" total loss amount of $193 million,[27] and a conceded total offense level of 48,[28] for which the Guidelines sentence was life imprisonment, Judge Seybert departed from the Guidelines and imposed a sentence of 180 months, primarily due to Gabayzadeh's age.[29]

- **John Rigas, Founder, Adelphia and Timothy Rigas, CFO, Adelphia (S.D.N.Y. 2004).**  The Rigas brothers were convicted of securities fraud, bankruptcy fraud, and conspiracy to commit securities fraud, conspiracy to commit bank fraud, and conspiracy to make or cause to be made false statements in filings to the SEC.  The loss amount in their cases was projected to be $2.3 billion, and the recommended Guidelines sentence for both of the brothers was life imprisonment, which was limited by a statutory maximum of 2,220 months (185 years).  John Rigas was sentenced to 144 months' (12 years) imprisonment (in part, due to his age and poor health, including heart trouble and bladder cancer), and Timothy Rigas was sentenced to 204 months' (17 years) imprisonment.[30]

---

1164.  The court also considered Mr. Ferguson's age; his character; his commitment to community service; his plans to become an ordained minister; and over 400 letters submitted on his behalf at sentencing.  *See* Judgment, *United States v. Ferguson*, No. 3:06-cr-00137, (D. Conn. Dec. 31, 2008), ECF No. 1199; *see also* Colleen McCarthy, *Ferguson Gets Two Year Sentence for Finite Fraud*, Business Insurance (Dec. 16, 2008), *available at* http://www.businessinsurance.com/apps/pbcs.dll/article?AID=9999200014797.

[27]  *See* Govt. Sentencing Memorandum, *United States v. Gabayzadeh*, Case No. 2:03-cr-00162 (E.D.N.Y. Sept. 20, 2006), ECF No. 183.

[28]  *See* Gabayzadeh Sentencing Letter, *United States v. Gabayzadeh*, Case No. 2:03-cr-00162 (E.D.N.Y. Aug. 17, 2006), ECF No. 180.

[29]  *See United States v. Gabayzadeh*, 428 F. App'x 43, 51 (2d Cir. 2011) (quoting Gabayzadeh Sentencing Tr. 86); Judgment, *United States v. Gabayzadeh*, No. 2:03-cr-00162 (E.D.N.Y. Nov. 23, 2006), ECF No. 190.

[30]  *See* Memorandum & Opinion, *United States v. Rigas*, No. 02-1236 (S.D.N.Y. June 24, 2008), ECF No. 428; *see also United States v. Rigas*, 490 F.3d 208, 239 (2d Cir.

Hon. Allyne R. Ross                                15                                July 15, 2013

- **Marc Dreier, Managing Partner, Dreier LLP (S.D.N.Y. 2009)**.  Dreier pled guilty to one count of securities fraud, four counts of wire fraud, and one count of conspiracy to commit securities and wire fraud.  The estimated loss amount was $387 million, resulting in an adjusted offense level of 44, and a Guidelines range of life imprisonment.[31]  At sentencing, the court observed that "every case has to be looked at in its own terms and not through some sort of abstract arithmetic calculation"; in rejecting the Guideline range and sentencing Dreier to 240 months, the court stated, "Mr. Dreier is not going to get much sympathy from this court, but he is not Mr. Madoff from any analysis, and that's why I can't understand why the government is asking for 145 years."[32]

- **Bernard Ebbers, CEO, WorldCom (S.D.N.Y. 2005)**.  Ebbers was convicted of conspiracy, securities fraud, and making false filings with the SEC as part of a "series of periodic, fraudulent financial reports that systematically inflated WorldCom's operating profits."[33]  Despite a loss amount estimated at well over $1 billion, resulting in a Guideline offense level of 42 and a Guidelines sentence range of 30 years to life, after taking into account Ebbers' age, his serious heart condition, and his charitable works, the court imposed a non-Guideline sentence

---

2007).  Initially, after the jury convicted the Rigases at trial, on June 27, 2005, the court imposed a sentence of 180 months' (15 years) incarceration on John Rigas and 240 months' (20 years) incarceration on Timothy Rigas.  The Second Circuit affirmed the conviction on all but one count (Count 23), which it reversed on and remanded for an entry of acquittal and for re-sentencing.  *Rigas*, 490 F.3d at 239.  At re-sentencing, the court stated "that the sentence previously imposed was fully justified under all of the circumstances," but nonetheless deducted 3 years from each sentence to account for the reversal on Count 23.  Memorandum & Opinion, at 8, *United States v. Rigas*, No. 02-1236, at 8 (S.D.N.Y. June 24, 2008), ECF No. 428.

[31]  *See, e.g.*, Govt. Sentencing Mem. at 11, *United States v. Dreier*, 09-cr-085 (S.D.N.Y. July 8, 2009), ECF No. 76; Def.'s Sentencing Mem. at n.2, *United States v. Dreier*, 09-cr-085 (S.D.N.Y. July 8, 2009), ECF No. 75; Dreier Sentencing Tr. 16:15–18, 28:18–25.

[32]  *See* Benjamin Weiser, *Lawyer Gets 20 Years in $700 Million Fraud*, N.Y. Times, July 13, 2009 (quoting Dreier Sentencing Tr. (S.D.N.Y. July 13, 2009)); *see* Judgment, *United States v. Dreier*, No. 09-cr-085 (S.D.N.Y. July 17, 2009), ECF No. 84.

[33]  *United States v. Ebbers*, 458 F.3d 110, 127 (2d Cir. 2006); *see* Order, *United States v. Ebbers*, No. 02-cr-1144 (S.D.N.Y. Sept. 8, 2005), ECF No. 336.

Hon. Allyne R. Ross                          16                        July 15, 2013

of 25 years because the court found that "30 years would be excessive and is unnecessary to satisfy the purposes of the sentencing statute."[34]

- **Andrew Mantovani, Leader of Online Credit Carding Ring (D.N.J. 2006).** Mantovani pled to one count of conspiracy to commit access device fraud and one count of access device fraud. Although the Government argued at sentencing that Mantovani was the leader of a 4,000-member online criminal organization which fraudulently transferred approximately 18 million e-mail accounts with associated usernames, passwords, dates of birth, and other personal identification information, and caused millions of dollars in loss,[35] the Government stipulated to a loss amount between $200,000 and $400,000, resulting in a total offense level of 25 and a Guidelines range of between 57–71 months.[36] Although the court noted that Mantovani played a "significant" role in this "serious" offense,[37] the court departed below the stipulated Guidelines range and imposed a sentence of 32 months.[38]

---

[34]   Ebbers Sentencing Tr. 31:3–6, 51:21–24, 59:22–25, *United States v. Ebbers*, No. 02-cr-1144 (S.D.N.Y. July 13, 2005). The sentencing court had estimated the loss amount at over $2 billion at sentencing; on appeal, the Second Circuit estimated the loss amount at well over $1 billion. The Second Circuit affirmed the sentence imposed by the district court. *Ebbers*, 458 F.3d at 128. Notably, several of Ebbers' co-defendants who were equally implicated in this fraud (and faced the same massive loss amount in their offense level calculation) but cooperated with the government and pled guilty instead of proceeding to trial received significantly shorter sentences: CFO Scott Sullivan received five years; Controller David Myers received one year and one day; Accounting Director Buford Yates received one year and one day; Director of Management Reporting Betty Vinson received five months; and Director of Legal Entity Accounting Troy Normand received three years on probation. *United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006).

[35]   Mantovani Sentencing Tr. 13:3–6.

[36]   Mantovani Sentencing Tr. 11:13–21.

[37]   Mantovani Sentencing Tr. 22:23–23:5.

[38]   *See* Indictment, *United States v. Mantovani*, 2:04 CR 00786, 2004 WL 3609591 (D.N.J. filed 2004); Sentencing Minutes, *United States v. Mantovani*, Case No.2: 04-cr-00786-01 (D.N.J. June 29, 2006), ECF No. 126.

Hon. Allyne R. Ross                                 17                                  July 15, 2013

2.   ***Mr. Vega's Offense Level and Guidelines Range Far Exceed the Offense Levels Calculated and Sentences Imposed in Cases Involving Serious Violent Crimes***

Not only is Mr. Vega's offense level disproportionate when compared to other more serious white collar cases, but it is substantially greater than the offense level and Guideline range assigned for murder, child molestation and other far more heinous crimes. For example, the offense level for first degree murder is 43, three levels less than Mr. Vega's offense level, *see* U.S.S.G. § 2A1.1(a)), and the offense level for pornographic exploitation of children is 38, eight levels less, *see* U.S.S.G. § 2G2.3); *see also Ebbers*, 458 F.3d at 129. Indeed, according to the U.S. Sentencing Commission Federal Sentencing Statistics, in 2011, the average sentence imposed in the Second Circuit was 228 months for murder, 195 months for kidnapping/hostage taking, 123 months for sexual abuse, and 63 months for assault.[39]

3.   ***A Sentence of Time Served Is Appropriate for Mr. Vega***

In the case of Mr. Vega, even when the Guideline range is capped off by the statutory maximum for the offenses of conviction, the resulting sentence of 330 months (27 ½ years) is disproportionate to the conduct for which he is being sentenced. While we do not mean to minimize the seriousness of Mr. Vega's misconduct, the enhanced offense level – which is largely based on the multiplication of the amount of credit card numbers on the laptop found in Mr. Vega's hotel room, with a presumed, but unproved, loss of $500 per card – is entirely arbitrary and results in a level substantially higher than that given to murderers, child abusers and violent offenders, not to mention white collar criminals who have caused actual losses of far greater magnitude to identifiable victims.[40]

---

[39]   *See* U.S. Sentencing Commission, Federal Sentencing Statistics 10, Tbl. 7 (2011), *available at* http://www.ussc.gov/Data_and_Statistics/Federal_Sentencing_Statistics/State_Distri ct_Circuit/2011/2c11.pdf.

[40]   The PSR contends that Mr. Vega's credit card trafficking began in the 1990s, but points to no specific facts in support of this contention. Although the PSR further states that Mr. Vega continued to administer CarderPlanet, an online carding forum, through August 2004, we understand from Probation that this is a mistake, as Mr. Vega was incarcerated in Cyprus and the Northern District of California from February 2003 to present. *See* PSR ¶ 21. Mr. Vega's guilty plea, for which he now faces sentencing, covered conduct occurring between October 2002 and February 2003 only.

Hon. Allyne R. Ross                          18                          July 15, 2013

This is particularly true where the amount of presumed loss bears no relationship to the actual amounts of money involved in Mr. Vega's conduct. *See, e.g.*, PSR ¶ 10(d) ("Boa [Vega][41] confirmed that he was offering to sell Shenon 300 counterfeit checks for $28 each, plus shipping (total: $8,420)."); PSR ¶ 10(e) ("On December 6, 2002, Script e-mailed Boa stating that he had transferred $300 to Boa's Webmoney account and was seeking to buy an additional 1,000 Gold and Platinum dumps . . . .") (roughly 30 cents per dump); PSR ¶ 10(m) ("On February 2, 2003, Kent/Amanda ordered over 1,000 additional dumps from ICQ user number 107711, at a total price of $91,356.") (roughly $91 per card); PSR ¶ 10(n) (discussing an exchange of 330–350 dumps for $14,998) (roughly $45 per card). In fact, in discussing the money laundering count, the PSR estimates the amount of "illicit business conducted by the defendant during the period of indictment*,"* to be "more than $1 million," *see* PSR ¶ 26. For a loss amount of $1 million, Mr. Vega's loss amount enhancement would be 16, resulting in a total offense level of 34 and a Guidelines sentence of 151–188 months.

Indeed, to date, more than ten years after Mr. Vega's arrest, the Government has presented no evidence regarding actual losses incurred as a result of Mr. Vega's conduct, nor has there been evidence regarding the intended amount of loss. Nonetheless, the calculated amount of intended loss results in a 28-point enhancement to Mr. Vega's offense level, accounting for well over half of the total offense level of 46.[42] Because this Guidelines range fails to even serve as a meaningful "starting point," *see Parris*, 573 F. Supp. 2d at 751, we urge the Court to follow the lead of other courts in the Second Circuit and elsewhere and impose a sentence below the Guidelines range.

---

[41]   The PSR states that Roman Vega was also known as "Boa" on the ICQ instant message system.

[42]   By comparison, the loss amount involved in the case against Mr. Vega in the Northern District of California case was quantified. According to the PSR, the evidence recovered during the California investigation indicated that Mr. Vega "personally traded full track information for 381 Visa credit cards. The Fraud Control Unit for Visa reported that 119 of these 381 accounts had been used in 738 fraudulent transactions totaling $222,971, in various locations around the world. . . ." *See* PSR ¶ 60. Assuming that this Court adopted this number as the loss amount for Mr. Vega's offense level computation, he would receive a 12 level loss-amount enhancement for a loss more than $200,000 but less than $400,000. *See* U.S.S.G. § 2B1.1(b)(1)(G). Applying this 12-level enhancement to Mr. Vega's offense level computation would result in a revised calculated offense level of 30. The Guidelines range for a defendant with an offense level of 30 and a criminal history category of I is 97–121 months. *See* U.S.S.G. Manual ch. 5, pt. A, Sentencing Table. Thus, based upon this loss amount, a sentence of time served would be more than appropriate for Mr. Vega.

B.      **Overlapping Enhancements Considerably Increase Mr. Vega's Guidelines Sentence**

An additional basis for departing from the Guidelines range for Mr. Vega's conduct is found in the well-established Second Circuit case law that authorizes a downward departure based on the cumulative effect of overlapping enhancements. *See, e.g.*, *United States v. Jackson*, 346 F.3d 22, 25–26 (2d Cir. 2003). Specifically, the Second Circuit has held that in some circumstances, an accumulation of somewhat overlapping enhancements, even if not amounting to double counting, can justify a downward departure. *Id.* Here, at least three separate enhancements applied in Mr. Vega's offense level computation substantially overlap, resulting in an inappropriately inflated total offense level: a 28-level enhancement for the loss amount; a 2-level enhancement for the use of sophisticated means; and a 4-level enhancement for being the "organizer and leader of a criminal activity that involved five or more participants, and was otherwise extensive." *See* PSR ¶¶ 30–53.

In *United States v. Jackson*, 346 F.3d 22 (2d Cir. 2003), the Second Circuit remanded and authorized the sentencing court to downwardly depart from the defendant's Guidelines sentence based on "overlapping enhancements" for the large sum of money involved, the careful planning required, the use of sophisticated means, and the extensiveness of the scheme, because "they [we]re all little more than different ways of characterizing closely related aspects of Jackson's fraudulent scheme." *Id.* at 26. In that case, the defendant pled guilty to identity theft and purchasing valuable items with his victims' bank and credit card accounts. The defendant's typical scheme involved identifying a wealthy target by searching the Internet, purchasing personal information about the target from an "information broker" on the Internet, then placing calls to banks, credit card companies, and hotels and using the target's personal information to impersonate the target. *Id.* at 23. The defendant would thereby obtain the victim's bank account and credit card information, increase credit limits on the victim's accounts or change the billing address to the address of a hotel before ordering and shipping merchandise to the hotel address using the target's credit card or bank account. *Id.*; *see also United States v. Savin*, 2004 WL 1161323, at *6–9 (applying a four-level departure for cumulative overlapping effects of enhancements due to application of 13-level loss amount enhancement, 4-level "financial institution" enhancement and two-level enhancement for more than minimal planning.).

The Second Circuit has found that such overlapping enhancements are particularly problematic at the upper ranges of the sentencing table, where "the cumulative effect of enhancements has a significant effect upon the applicable sentencing range." *United States v. Lauersen*, 348 F.3d 329, 344 (2d Cir. 2003); *see also United States v. Sofsky*, 287 F.3d 122, 124 n.1 (2d Cir. 2002) (noting "a phenomenon of the

Hon. Allyne R. Ross                          20                          July 15, 2013

Guidelines whereby individual adjustments call for somewhat modest increments of punishment when only one or two are added, but result in substantial increments of punishment when several are aggregated together").

Here, as in *Jackson*, Mr. Vega is accused of using "sophisticated means" to commit fraud. However, as in *Jackson*, the enhancements in Mr. Vega's case take into account only minimally different aspects of the overall crime, and the cumulative effect of the various enhancements is considerable: Mr. Vega's loss amount enhancement alone, combined with the base offense level, results in an offense level computation of thirty four. At this range, the addition of two levels for sophisticated means increases the Guidelines range from 151–188 months to 188–235 months, and an additional four levels for being the "organizer and leader" increases the range to 292–365 months. Given the unreasonably harsh effects of overlapping enhancements in Mr. Vega's Guidelines offense level, and given the non-violent nature of Mr. Vega's offense, we respectfully request that the Court consider this as an additional basis for reducing his sentence below the Guideline range.

C.      **The Unique Circumstances of this Case and Mr. Vega's Contributions to the Public Good Warrant a Sentence of Time Served**

Under § 3553(a)(1), the Court shall examine "the nature and circumstances of the offense and the history and characteristics of the defendant" when determining an appropriate sentence. In this case, the Court should also consider the unique circumstances of Mr. Vega's offense, the case's procedural history, and his character.[43] A sentence of time served—amounting to over ten years of incarceration, more than nine of which have been in federal custody—will serve as a strong deterrent and is sufficient, but not greater than necessary, to adequately serve the intended purposes of incarceration for Mr. Vega's conduct.

If Mr. Vega is sentenced to time served, he is likely to return to being a productive member of society. Mr. Vega's participation in the crimes to which he pled guilty represents only one small period of his life and one facet of the total picture of his character. As set forth in the background section above, Mr. Vega has been a productive member of society throughout his life and can continue to make a positive contribution after his release from prison.

---

[43]     We respectfully request that the Court hold an *in camera* conference to discuss with counsel the unique posture of this case and the related considerations that the Court should take into account in that regard when determining Mr. Vega's sentence.

Hon. Allyne R. Ross                      21                     July 15, 2013

Mr. Vega has no prior criminal record and, to the contrary, has participated in several endeavors that demonstrate leadership qualities, good character, and concern for others. Mr. Vega has held several meaningful jobs and positions, both in the military and in the private sector, and his history of steady and productive employment and good character may be considered by the Court at sentencing. *See, e.g., United States v. Jimenez*, No. 07-CR-92, 2007 WL 3010625, at *1 (E.D.N.Y. Oct. 11, 2007); *United States v. Edelman*, No. 06-CR-0002 (RWS), 2006 WL 1148701, at *6 (S.D.N.Y. Apr. 24, 2006). In addition, despite his confinement, Mr. Vega has maintained strong family relationships and exerted a positive influence on fellow inmates, serving as an education aid and a yoga and tai chi instructor. *See* PSR ¶ 80.

### D.   Mr. Vega's Nine-Year Pre-Sentence Confinement Warrants a Downward Departure

Mr. Vega has spent more than nine years in pre-sentence confinement, serving over a year at various local jails in the Northern District of California, two-and-a-half years at the FCI Dublin facility in California, and, most recently, serving more than five years at the MDC in Brooklyn. Mr. Vega has also served roughly six months of that time at the MDC in the Special Housing Unit ("SHU"), in which inmates are confined to their cells for 23 hours a day.

The Second Circuit has held that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures."[44] That is because in these pre-sentence detention centers, the "conditions, and the amenities or lack of amenities are harsher than those in the Bureau of Prisons facilities to which convicted persons are designated after sentencing."[45] We respectfully submit that the conditions and length of Mr. Vega's pre-trial detention are an additional basis for the Court to impose a sentence of time served.

A sentencing court may consider the circumstances of a defendant's pretrial confinement "in either length or severity of condition."[46] Indeed, when determining

---

[44] *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001).

[45] Solano Sentencing Tr. 38:19–25, *United States v. Solano*, 05 CR 563 (LTS) (S.D.N.Y. Nov. 18, 2011).

[46] *See United States v. Sutton*, No. 07-426 (KSH), 2007 WL 3170128, at *4, 9 (D.N.J. Oct. 25, 2007) (citing *United States v. Sutton*, 973 F. Supp. 488, 493–94 (D.N.J. 1997)).

Hon. Allyne R. Ross                    22                    July 15, 2013

whether a sentence is "sufficient, but not greater than necessary," sentencing courts have recognized that pretrial detention can have both deterrent and punitive effects: "There can be little doubt that pretrial detention in substandard conditions can have a punitive effect not contemplated by the Guidelines."[47]

Courts have downwardly departed in cases of pre-trial detention of far lesser duration than what Mr. Vega has endured. For example, in *United States v. Francis*, 129 F. Supp. 2d 612 (S.D.N.Y. 2001), the court found that a thirteen and one-half month tenure in such a facility warranted a downward departure "to acknowledge the qualitatively different, substandard conditions to which Defendant was subjected for an extended period."[48] In *United States v. Solano*, 05 CR 563 (LTS) (S.D.N.Y. filed May 24, 2005), the court found a downward departure from the Guidelines was warranted when, *inter alia*, the defendant had been subject to six years of detention at the MDC in Brooklyn: "I have also considered the fact that . . . Mr. Solano has spent the last 6 years in detention facilities where the conditions and the amenities or lack of amenities are harsher than those in the Bureau of Prisons facilities to which convicted persons are designated after sentencing."[49]

Other district courts in this Circuit have held that downward departures are appropriate where the conditions of pre-sentence confinement are severe in nature or suffered by the defendant in "some highly unique or disproportionate manner."[50]

---

[47]   *Sutton*, 973 F. Supp. at 493 (citing *United States v. Salerno*, 481 U.S. 739, 746 (1987)); *Sutton*, 2007 WL 3170128, at *9 (since pretrial detention becomes part of the overall sentence served by a defendant, the sentencing court "must factor into the full sentence the overly punitive nature of such an experience"); *see also United States v. Baum*, No. 04-CR-508 (JBW), 2007 WL 3274894, at *2 (E.D.N.Y. Oct. 30, 2007) (Weinstein, J.) (taking into consideration defendant's "difficult incarceration in federal custody" for almost four years prior to his sentencing).

[48]   *United States v. Francis*, 129 F. Supp. 2d 612, 619 (S.D.N.Y. 2001).

[49]   Solano Sentencing Tr. 38:19–25, *United States v. Solano*, 05 CR 563 (LTS) (S.D.N.Y. Nov. 18, 2011).

[50]   *United States v. Mateo*, 299 F. Supp. 2d 201, 208 (S.D.N.Y. 2004); *see also United States v. Brooks*, No. 07-CR-00187, 2008 WL 4693335, at *1–4 (E.D.N.Y. Oct. 23, 2008) (granting motion for a reduction in a defendant's sentence based on the conditions of confinement in the SHU at the MDC, where the defendant had been housed for almost a year); *United States v. Baum*, No. 04-CR-508 (JBW), 2007 WL

Hon. Allyne R. Ross                       23                       July 15, 2013

In *United States v. Brooks*, granting the defendant's motion for a reduction in his imposed sentence, Judge Sifton concluded that the defendant's confinement for almost a year in the segregated housing unit ("SHU") at the MDC warranted a downward departure from the Guidelines sentence.[51]  In particular, the court noted that:

> While defendant was in the SHU, he was not permitted religious or family visits and was only permitted one telephone call per month.  He states that the cell which he was restricted to for twenty-three hours a day was unsanitary and the food he was served was substandard . . . .[52]

Noting that the conditions of the defendant's confinement in the SHU were contrary to the policies of the Bureau of Prisons ("BOP"), Judge Sifton ruled that the MDC's failure to adhere to the BOP's policies, along with the defendant's credible description of the conditions of his confinement and his mental state as a result thereof, warranted a downward departure.[53]

As courts in this district have acknowledged, the conditions at the MDC are much more severe than in a typical federal correctional institution.  The MDC is overcrowded and houses non-sentenced and sentenced inmates, as well as extremely violent offenders. The inmates are housed in a windowless, open dormitory-style unit with 60 double-bunk beds each separated by only two feet.  The 120 inmates housed in the unit share five toilets, showers and sinks.  In addition, the MDC lacks an outdoor yard, so inmates are unable to partake in any outdoor recreation during their confinement at the MDC.  Thus, Mr. Vega has not had outdoor recreation in well over 5 years.  Mr. Vega has also reported difficulty obtaining medical and dental services at the MDC.[54]

---

[ ]  3274894, at *2 (E.D.N.Y. Oct. 30, 2007) (reducing defendant's sentence based on length and conditions of defendant's pre-sentence incarceration).

[51]  *Brooks*, 2008 WL 4693335, at *1–4.

[52]  *Id.* at *1.

[53]  *Id.* at *4 (reducing defendant's sentence from 37 months to 31 months).

[54]  *See* PSR ¶ 83; *see also* Motion to Reschedule May 19, 2011 Status Conference Hearing due to Injury, Pain and Suffering and Deliberate Indifference (May 16, 2011), ECF No. 48; Motion to Dismiss Indictment or in the Alternative Motion for Assistance in Medical Care (June 3, 2011), ECF No. 53.

Hon. Allyne R. Ross                            24                            July 15, 2013

Mr. Vega also served about six months in the SHU at the MDC. *See* PSR ¶ 79. In the SHU, Mr. Vega's access to programs and other resources at the MDC was further limited. While in the SHU, access to the Commissary is completely restricted. Mr. Vega was also restricted from accessing his legal papers and email by Corrlinks, and was further limited to one phone call per month. Mr. Vega's access to the law library at the facility was also severely restricted while he was in the SHU, and he was not permitted to participate in any other activities offered at the MDC at that time.

Mr. Vega's experiences at the MDC are consistent with those conditions identified in the *Brooks* and *Solano* cases. We submit that Mr. Vega's three-and-a-half years in pre-sentence incarceration in California and more than five-and-a-half years served at the MDC, including six months served in the SHU—much longer than the standard pre-sentence incarceration at this facility—also warrant imposition of a non-Guidelines sentence of time served.

## VI.   Conclusion

Mr. Vega has already served more than ten years in jail since his arrest in Cyprus on February 26, 2003. He has been in federal custody since June 3, 2004 (in the Northern District of California) and in custody in the Eastern District of New York since November 5, 2007. For the reasons discussed above, we respectfully submit that a sentence of time served is "sufficient but not greater than necessary" to achieve the purposes of incarceration. A longer sentence is unlikely to have a greater deterrent effect and it will only serve to cause additional hardship to Mr. Vega and his family.

Respectfully submitted,

Matthew E. Fishbein
Erica S. Weisgerber

cc:     Assistant United States Attorney William Patrick Campos
        United States Probation Officer Cheryl Fiorillo

Enclosures

23901658v13