

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

EMN:CNP:WPC/TAD                     *271 Cadman Plaza East*
F.#2007R00950                       *Brooklyn, New York 11201*

October 3, 2013

**By ECF and By Hand**

The Honorable Allyne R. Ross
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re:  United States v. Roman Vega
          Criminal Docket No. 07-CR-707 (ARR)

Dear Judge Ross:

      The government respectfully submits this letter in support of its sentencing recommendation in the above-referenced case and requests that a sentencing date be scheduled for defendant Roman Vega.

      As set forth below, in 2009, the defendant pleaded guilty pursuant to a cooperation agreement to Conspiracy to Commit Access Device Fraud in violation of 18 U.S.C. § 1029 and Conspiracy to Commit Money Laundering in violation of 18 U.S.C. § 1956(h).  The defendant subsequently breached the terms of the agreement.

      Vega, whose online nicknames included, "Boa," "Randy Riolta" and "RioRita," was a criminal pioneer in the world of credit card fraud.  Through his criminal leadership, he cofounded one of the most notorious websites for computer hacking, money laundering and credit card fraud.  His website, CarderPlanet, became an infamous online criminal marketplace where untold millions of stolen credit card numbers were sold,

and helped create the illicit infrastructure that cybercriminals needed to buy and sell their stolen credit card data – an infrastructure that cybercriminals continue to use to this day, at great detriment to U. S. financial institutions and other businesses.

According to the amended pre-sentence investigation report ("Amended PSR"), based upon the defendant's criminal history category of I and his combined adjusted offense level of 46, the Guideline range of imprisonment is life. See Amended PSR at ¶ 108. The statutory maximum term of imprisonment, however, is 27.5 years. See Amended PSR at ¶ 108.

For reasons set forth below, the government opposes the defendant's request that he be sentenced to a below Guidelines sentence of time served. Such a sentence is insufficient to accomplish the goals of Section 3553(a) of Title 18 of the United States Code: namely, to reflect the seriousness of this offense, promote respect for the law, provide just punishment and general deterrence and avoid unwarranted sentencing disparities. As such, the government respectfully requests that the Court sentence the defendant to a substantial term of imprisonment and recommends, a term of at least 20 years' incarceration.

I. Background and Procedural History

A. Vega's Arrest in Cyprus

In February 2003, the defendant Roman Vega, a Ukrainian citizen, was arrested in Cyprus for violating the laws of Cyprus. Cypriot authorities also seized Vega's Sony VAIO laptop computer, among other things, and eventually provided it to United States law enforcement agents. Vega's laptop contained hundreds of thousands of compromised credit card numbers, related information, identity documents and the logs of Internet "chats" (i.e., instant message communications). Vega was prosecuted and convicted in Cyprus, where he remained incarcerated until approximately May 7, 2004.

    B.    <u>Vega's Extradition from Cyprus to California</u>

On or about May 7, 2004, Vega was detained in Cyprus pursuant to a provisional arrest request made by the United States Attorney for the Northern District of California. Vega consented to his extradition to the United States. On or about June 3, 2004, Vega was transported from Cyprus to the Northern District of California.

    C.    <u>The NDCA Case Against Vega</u>

On June 4, 2004, Vega was arraigned on an indictment in the Northern District of California. <u>See</u> <u>United States v. Vega</u>, 04 CR 101 (CRB)(N.D.CA.). Vega filed a motion to suppress statements on August 26, 2004.

On March 16, 2005, Vega was arraigned on a second superseding indictment (the "NDCA Superseding Indictment"). Counts One through Twenty of the NDCA Superseding Indictment charged Vega with wire fraud and identified 20 specific fraudulent credit card transactions. Counts 21 through 40 charged Vega with Access Device Fraud and identified an additional 20 specific fraudulent credit card transactions.

Pursuant to a written plea agreement dated November 9, 2006, Vega pleaded guilty to Counts One through Twenty of the NDCA Superseding Indictment. In his plea, Vega admitted that in February 2003 he traveled to Cyprus to engage in a scheme to defraud as alleged in paragraphs 8 to 10 of the NDCA Superseding Indictment.

On October 11, 2007, the NDCA Court ordered that Vega be removed pursuant to Rule 5 to the EDNY to be arraigned on the EDNY Indictment discussed below. Vega was not, and has not yet been, sentenced on his NDCA case.

    D.    <u>The EDNY Case Against Vega</u>

On August 24, 2007, then-United States Magistrate Judge Kiyo Matsumoto issued a warrant for Vega's arrest based on a criminal complaint charging conspiracy to commit access device fraud in violation of 18 U.S.C. § 1029(c)(1)(A)(ii). The EDNY

3

complaint was unsealed on August 28, 2007. On September 18, 2007, a Grand Jury returned a two-count indictment against Vega, charging him with Conspiracy to Commit Access Device Fraud and Money Laundering Conspiracy (the "EDNY Indictment").

Vega was transported in custody from California to New York and on November 9, 2007, he was arraigned on the EDNY Indictment and pleaded not guilty. Thereafter, Vega began meeting with the government in an effort to cooperate.

On January 26, 2009, Vega pleaded guilty to both counts of the EDNY Indictment pursuant to a cooperation agreement. On April 5, 2011, however, Vega moved to withdraw his guilty plea based upon alleged ineffective assistance of counsel and his claim that he was actually innocent of the crimes to which he pleaded guilty. Vega also supplemented his motion in August 2011. On May 24, 2012, this Court filed and published its Opinion and Order denying Vega's motion to withdraw his guilty plea.

## II. Vega's Offense Conduct

The defendant, Roman Vega, was a "carder." That is, he and others conspired to steal large volumes of credit card information through computer intrusions and other sophisticated means, and then sold that stolen information to others, who ultimately used the credit card information to purchase merchandise and services. Vega founded two different online marketplaces for this stolen credit card data, using the following Internet nicknames: "Boa," "Randy Riolta" and "RioRita."

### A. Boa Factory

The defendant founded an Internet carding site known as Boa Factory (www.boafactory.com) in the late 1990s. It was a website where sellers of stolen credit card information could meet potential buyers. The site also provided money laundering services and created fake identification documents such as passports. See PSR ¶ 21.

B.  <u>CarderPlanet</u>

During approximately 2001 until his arrest in Cyprus, the defendant also co-founded and became a high ranking administrator of a carding website known as CarderPlanet, one of the first and most significant carding sites on the Internet at the time. It became a cyber-marketplace for the sale of stolen financial data, computer hacking services and money laundering. <u>See</u> PSR ¶ 21 and 22.

CarderPlanet had more than 6,000 members and had a hierarchial leadership structure that borrowed its leadership titles from the mafia. For example, CarderPlanet was headed by a Godfather - a Ukranian individual known as "Script" whose true name was Dimitry Golubov. Immediately below the Godfather were the Dons. There were up to five Dons and the defendant, using the name "Boa," was one of them. Two levels below the Dons was the Consigliere, who was an advisor. The defendant, using the name "RioRita," was the Consigliere. Attached as Exhibit 1 is a copy of a July 2003 Internet posting published by Script (Golubov) regarding the CarderPlanet structure.

CarderPlanet became a premier online criminal bazaar as a result of the Vega's leadership. The defendant helped institute a type of review system for sales. If a carder wanted to sell stolen credit card data on CarderPlanet his wares were vetted by a CarderPlanet manager. If the credit card data was as it was purported to be then a sale could occur. Likewise, the buyer's funds were vetted. In this way, CarderPlanet and Vega created an efficient and trustworthy system for the buyers and sellers of stolen financial data.

During his period of cooperation, Vega admitted that he was a member and co-founder of CarderPlanet and had an instrumental role in the CarderPlanet website. He admitted that he instituted rules and imposed order among the carders, and that he encouraged carders to institute a type of peer review system to prevent fraud amongst carders. Vega also described efforts to encourage carders to acquire the equipment and expertise necessary to emboss white plastic as a means to make his own business more profitable and less risky by allowing him

to deal almost exclusively in computer files containing credit card data. Vega stated on several occasions that while other individuals on the CarderPlanet forum had visible leadership roles, he was often able to individually guide the direction of CarderPlanet without fully being exposed.

CarderPlanet, as created by the defendant, attracted many well-known and high-level carders and hackers, including:

- Albert Gonzalez, also known as "Cumbajonny," had a presence on the website selling credit card information. Gonzalez was later prosecuted in the Districts of Massachusetts, New Jersey and the Eastern District of New York for computer hacking and access device fraud and was sentenced to 20 years' incarceration.

- Maksim Yastremskiy, also known as "Maksik," had a presence on the website. He was indicted in this district as a co-conspirator of Gonzalez, discussed above. Yastremskiy was separately convicted and sentenced to 30 years' imprisonment in Turkey on computer hacking charges. He is currently serving the remainder of his sentence in his native Ukraine, which does not have an extradition treaty with the United States.

- Cesar Carranza was a money launderer for carders and sold credit card making equipment. He advertised on CarderPlanet and used digital Internet currency such as Webmoney to help carders launder their unlawful proceeds. He was sentenced in the EDNY to six years' incarceration for laundering $2.5 million.

When the defendant went to Cyprus he had a Sony Vaio laptop, among others. That Sony Vaio laptop contained more than 500,000 stolen credit card numbers issued from over 7,000 different financial institutions throughout the world.

    C.    Computer Hacking

In addition to his duties at CarderPlanet and Boa Factory, the defendant also directed cells of financial crime teams throughout the globe. These teams would conduct computer hacking to steal credit card and financial data that would be sold on the carding forums, including CarderPlanet. See PSR ¶ 21 and 22.

III.    Vega's Post-Plea Conduct

    A.    Vega's Cooperation

The defendant pleaded guilty pursuant to a cooperation agreement. The defendant acknowledged his guilt and provided historical information about his own criminal activity and that of his co-conspirators on CarderPlanet. Vega also was able to identify photographs of his carding co-conspirators. As such, the information the defendant provided to the government was useful as background intelligence. Unfortunately, the government was unable to use the dated information to make any arrests or file any complaints or indictments. Despite these efforts to cooperate, the government does not move pursuant to U.S.S.G. § 5K1.1 to permit the court, in its discretion, to impose a below Guidelines sentence because Vega breached his cooperation agreement by filing his motion to withdraw his guilty plea and claiming, among other things, that he was actually innocent of the crimes to which he pleaded guilty and had described on numerous occasions to the government. In addition to this material breach of the cooperation agreement, Vega engaged in other misconduct since his guilty plea, as described below.

    B.    Vega Sent Letter To Analyst

Before filing his first letter to withdraw his guilty plea, Vega had been interviewed by agents and analysts of the U.S. Secret Service on several occasions. During one such interview, Vega expressed a desire to pro-actively cooperate, communicate with other carders and assist the government. When an analyst expressed skepticism that Vega would be able to

7

reconnect into his carding network, Vega took umbrage. To prove his connections with an international network, Vega caused a letter to be sent to the analyst's residence. The typed letter, which is in English and attached as Exhibit 2 (the analyst's name has been redacted), was delivered by mail to the analyst's residence, which was not publicly listed. The letter was "signed" by "Boa," Vega's alias. The envelope's postmark indicated that it was mailed from Italy.

The government confronted the defendant with the letter. His former Federal Defender attorney was present. Vega admitted that he caused the letter to be delivered to the residence using his international network. Vega explained that after obtaining bits of personal information about the analyst during the debriefing sessions, he and his international network where able to find the unlisted address of the analyst. Vega claimed that the letter was not sent to intimidate or frighten the analyst but rather to demonstrate that he still had access to an international network of individuals.

    C.    <u>Vega Lied About Sending Money To Girlfriend</u>

At the same meeting where Veag's letter to the analyst was discussed, the government also confronted Vega with a transcript of a phone call he made from the Metropolitan Detention Center ("MDC"), where he remains incarcerated, to his girlfriend. The call was in Russian and the transcript was in Russian with English translations. Vega reviewed the transcript and agreed that the English language version correctly translated the Russian version. Vega also stated that he did not allow other inmates to use his telephone identification number. Significantly, the transcript stated in part:

    Female:    Things are well. Well, I got the money from you.

    Vega:    You got the money? Good for you. I congratulate you with the money.

Despite this clear evidence, Vega hid behind the well-worn expression, "I do not recall." Vega further claimed that

he had no money to send anyone despite agreeing that the transcript was correct.

    D.    <u>Vega Sent Letter to Author</u>

Vega's claims of actual innocence are especially unbelievable because he corresponded with a noted author who was writing a book about cybercriminals. Vega admitted – indeed boasted – about his role in CarderPlanet. During his incarceration at the MDC, Vega corresponded with author Misha Glenny about the subject matter which was included in Glenny's book, <u>Dark Market: Cyberthieves, Cybercops and You</u>, which was published and became widely available in the United States in October 2011. The book discussed, among other things, CarderPlanet and Vega.

Before Glenny's book was published, Vega sent a letter from the MDC to Glenny. The small Post-It note on the letter stated in pertinent part:

> Misha, it's a draught [sic] I wrote you about (by e-mail) which I wrote (and unfinished) about two-three months ago. Maybe you will glean something useful from it. **Let me remind you that all information you got from me for MS, you got from RioRita, not from B or R. Vega. It's crucial.** Hope your Kiev trip was successful.
> Regards Roman.
> (Emphasis added).

In the note, Vega stressed that Glenny should report that the information provided in the letter for Glenny's manuscript was not from Boa or from Roman Vega. Vega wanted Glenny to report that the information came from RioRita. Vega had previously told the government that RioRita was a name he used to conceal his identity such as when the he did something that was too insignificant for Boa to have done.

Glenny acknowledged the importance of RioRita when he wrote in the Acknowledgement section of his book, "RioRita in

Ukraine was a mine of information about CarderPlanet and beyond - my special thanks to him."

### E. Vega's Motion to Withdraw Guilty Plea

More than two years after pleading guilty, Vega submitted his first letter, which was later supplemented and formed his motion to withdraw his guilty plea. Vega sought to withdraw his guilty plea based upon, inter alia, his claims of ineffective assistance of counsel and actual innocence. On May 24, 2012, this Court filed and published its Opinion and Order denying Vega's motion to withdraw his guilty plea.

### F. The Defendant Was Found With Contraband

While at the MDC, the defendant received in the mail a credit card sized device which, when attached to a cell phone or smart phone, acted as the equivalent of a 4-foot antennae to enhance reception. The defendant was suspected of having or knowing who had a cell phone. He refused to provide information to the prison officials and was placed in the Special Housing Unit ("SHU"). While no phone was ever discovered, given the defendant's Internet blogging efforts discussed below, it would appear he sought a device to take photos and connect to the Internet.

### G. Internet Blogging While Incarcerated

It appears the defendant sought the contraband, discussed above, to connect to the Internet while incarcerated. The government has recently learned that the defendant apparently maintains or has others maintain for him the following websites while incarcerated at the MDC:

> www.RomanVega.com;
> www.3W3RR.com;
> www.RomanVega.ru;
> www.3W3RR.ru; and
> https://twitter.com/RomanVega_com.

The websites provide first-person accounts of Vega's journey in the criminal justice system. Vega explains, among other things, his arrest in Cyprus, his insider's account of the

procedural history of his cases and his denial of being "Boa" of CarderPlanet – he continues to deny his guilt despite his guilty plea pursuant to a cooperation agreement. For example, in the first listed website, above, Vega wrote:

> I was last arrested in 2003 in Cyprus, as alleged to be Boa and charged (on the base of very flimsy and circumstantial evidence) of being one of the organizers and leaders of the criminal hacker-carder syndicate CarderPlanet and BoaFactory.
>
> \*   \*   \*
>
> A plea bargain was reached between my lawyers, the Judge Breyer and the prosecutor in 2007. If I was to give up a jury trial and sign paperwork pleading guilty by association, without admitting that I am Boa (as they baselessly stated in the indictment and everywhere else), I would be set free, with time already served in detention.

That first-listed website also posts photographs of various prisons including the exterior of the MDC. Vega also posted the Guidelines calculations from his PSR. It would appear that Vega seeks to broadcast his continued claim of actual innocence despite his guilty plea and the court's order denying his motion to withdraw that plea. Vega's actions demonstrate his utter lack of remorse and acceptance of responsibility.

IV.  The Defendant's Guidelines Range

The defendant's Guidelines calculation for Count One is as follows:

| U.S.S.G. Description | U.S.S.G. Section | Points |
|---|---|---|
| Base Offense Level | 2B1.1(a)(2) | 6 |
| Loss Amount Between $200 and $400 million | 2B1.1 (b)(1)(O) [Application Note 3(F)(I)] | 28 |
| Stolen Property Business | 2B1.1(b)(4) | 2 |
| Fraud from Outside U.S. and Sophisticated Means | 2B1.1(b)(9) | 2 |
| Use of Device Making Equipment | 2b1.1(10) | 2 |
| Organizer and Leader of 5 or more Participants | 3B1.1(a) | 4 |
| Adjusted Offense Level for Count One | | 44 |

| U.S.S.G. Description | U.S.S.G. Section | Points |
|---|---|---|
| Base Offense Level | 2B1.1(a)(2) | 6 |
| Loss Amount Between $200 and $400 million | 2B1.1 (b)(1)(O) [Application Note 3(F)(I)] | 28 |
| Stolen Property Business | 2B1.1(b)(4) | 2 |
| Fraud from Outside U.S. and Sophisticated Means | 2B1.1(b)(9) | 2 |
| Use of Device Making Equipment | 2b1.1(10) | 2 |
| Organizer and Leader of 5 or more Participants | 3B1.1(a) | 4 |
| Adjusted Offense Level for Count One | | 44 |

The defendant's Guidelines calculation for Count Two is as follows:

| U.S.S.G. Description | U.S.S.G. Section | Points |
|---|---|---|
| Base Offense Level | 2S1.1(a)(1)  See also 1B1.5(b)(1) | 40 |
| Specific Offense Characteristic  Convicted under 18 U.S.C. § 1956 | 2S1.1(b)(2)(B) | 2 |
| Organizer and Leader of 5 or more Participants | 3B1.1(a) | 4 |
| Adjusted Offense Level for Count Two | | 46 |

The combined adjusted offense level is 46. See Amended PSR ¶ 51. Based upon the defendant's criminal history category of I, the Guidelines term of imprisonment is life. The statutory maximum term of imprisonment is 27.5 years. See Amemded PSR ¶ 108.

V.   Vega's Objections to the Offense Level Calculations

The defendant complains that the loss amount overstates the seriousness of the offense. He also complains that the Guideline enhancements unduly overlap, resulting in a

13

cumulative effect that improperly increases the Guidelines level.  These arguments are without merit.

A district count may mitigate the effect of cumulative sentencing enhancements by downwardly departing in instances where the sentencing enhancements are "little more than different ways of characterizing closely related aspects of [the defendant's] fraudulent scheme." United States v. Jackson, 346 F.3d 22, 26 (2d Cir.2003).

Here, the enhancements do not overlap and are not unduly cumulative.  Each enhancement captures a distinct aspect of Vega's scheme.  After all, Vega was not a mere, low-level mule with 500,000 plastic credit cards in a backpack.  Rather, he was a sophisticated criminal visionary who devised an efficient and safe marketplace for other criminals while separately organizing his own criminal network.  He did this on a worldwide level using extremely sophisticated and technically skilled conspirators.

Vega was in the business of obtaining stolen financial and credit card information by hacking and selling it to others, and facilitating the purchase by others.  The magnitude of loss is an independent variable and the Guideline enhancement is designed to capture that variable.  As a result, the enhancement for being in the stolen property business (U.S.S.G § 2B1.1(b)(4)) does not improperly duplicate the enhancement for loss of over $200 million (U.S.S.G § 2B1.1(b)(1)(O)) or for the use of device-making equipment (U.S.S.G § 2B1.1(10)) or for using sophisticated means (U.S.S.G § 2B1.1(b)(9)).

The defendant's business was not a street level hand-to-hand business.  Rather, it was a sophisticated worldwide business and that enhancement captures that independent variable.  The defendant and his co-conspirators also used equipment to convert and helped others to convert the ephemeral, digitized financial information into a usable form, that is, into a magnetic-strip plastic card.  These enhancements, in this case, capture a unique aspect of the defendant's criminal activity.

Consequently, there should be no downward departure based upon overlapping cumulative enhancements.

VI. A Substantial Sentence Of At Least 20 Years Is Reasonable And Appropriate

The government recognizes that since United States v. Booker, 543 U.S. 220 (2005), the Sentencing Guidelines are advisory rather than statutorily mandated. However, when imposing a sentence, the Court is required to consider the guidelines and fashion a sentence that is consistent with the factors detailed in 18 U.S.C. § 3553(a). Here, the Guideline range is life and the statutory maximum is 27.5 years for this case where the defendant created a new and efficient world-wide marketplace for hackers, carders and money launderers, which for a time, was the place of choice for such criminals who stole and sold untold millions of credit cards. In light of the factors set forth in 18 U.S.C. § 3553(a), the United States contends that a substantial sentence of no less than 20 years, which is well below the advisory Guidelines range, is reasonable and appropriate.

Under Section 3553(a), the sentence imposed must reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public. See United States v. Wilson, 350 F.Supp.2d 910 (D.Utah 2005). The sentencing court must also consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). A court that imposes a sentence outside the applicable advisory Guidelines range must state "with specificity" both at sentencing and in the written judgment and commitment order its reasons for doing so. 18 U.S.C. § 3553(c).

This Court must also consider all of the sentencing considerations set forth in Section 3553(a). Gall v. United States, 552 U.S. 38 at 49-50 (2007). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote

15

respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

 A. <u>Nature and Circumstances of the Offense</u>

  The defendant founded a website wholly dedicated to criminal activity, namely, CarderPlanet. He realized that hackers who steal credit card and financial data need a reliable and safe marketplace to sell their wares to other criminals, who eventually use the data. Indeed, he organized the so-called Carders' Convention in Odessa, Ukraine, as a further effort to organize these criminals. CarderPlanet became the marketplace of choice for carders, hackers and money launderers. Some of the most significant carders, hackers and money launders appeared on CarderPlanet to do their criminal business. The volume of stolen financial data (e.g., stolen credit card numbers) that passed hands on CarderPlanet likely numbered in the tens of millions. The defendant also founded the website known as Boa Factory. It was a website for carding and the creation of false identification documents. The defendant also engaged in his own hacking conspiracies separate and apart from his administration of CarderPlanet.

  Against this backdrop, the defendant was found in possession of laptops that had stolen credit cards. On the Sony VAIO laptop the defendant had over 500,000 separate credit card numbers.

B.  History and Characteristics of the Defendant and The Need to Afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of the Defendant

Before his criminal carding activity, the defendant was in the Soviet army and later a ham radio enthusiast who had developed a global network and traveled the world to broadcast from remote and forbidden places.

The defendant's civilian employment was initially as a seller of surveillance equipment. He was an intelligent businessman. As such, he engaged in a cost-benefit analysis of whether to follow the path of criminal activity. The defendant determined the obvious choice for him was to become a thief, credit card fraudster and money launderer. Through his leadership, the defendant made CarderPlanet the archetype of a well-run and successful criminal website.

When indicted in the EDNY, the defendant again conducted a cost-benefit analysis, and decided to enter into a cooperation agreement. When that agreement no longer served his purposes he sought to withdraw his plea.

It must be demonstrated to this defendant that the cost to him of perpetrating his crimes will be greater than the benefit. Given his apparent refusal to accept responsibility for his crimes and his proven network of criminal contacts (as demonstrated by the letter he sent from Italy to the analyst), it is almost certain that, if sentenced to time served and deported to the Ukraine, Vega will continue his criminal activity likely immediately. It must also be demonstrated to other carders, who also engage in a cost-benefit analysis, that when caught, they will be fairly but sternly punished. In this way, a sentence of at least 20 years' incarceration should provide adequate specific and general deterrence.

17

C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

A sentence of at least 20 years should be imposed to reflect the seriousness of the offense, promote respect for the law and provide just punishment. Such a sentence would be consistent with sentences meted out to other, similarly situated cybercriminals:

1. In United States v. Albert Gonzalez (D. MA. and E.D.N.Y.), on September 11, 2009, Gonzalez was sentenced to 20 years for two hacking schemes. Like Vega, Gonzalez was a breached cooperator. In the EDNY, Gonzalez and co-defendants hacked into the point-of-sale terminals used by a Dave & Busters restaurant and stole approximately 7,000 credit card numbers. In the Boston case, the defendant and his crew stole approximately 45 million credit card numbers. Vega, while perhaps not as prolific an individual hacker, had a greater and more lasting impact in the carding community. His criminal achievement of creating a marketplace for cybercriminals facilitated the sale of untold millions of stolen credit card numbers throughout the world and facilitated the laundering of the unlawful proceeds.

2. In United States v. Edwin Pena, 09 CR 103(SDW)(D.N.J.), the defendant was sentenced, on September 24, 2010, after his guilty plea to wire fraud, to 10 years' incarceration and restitution of $1,012,311. Pena hacked into the networks of Voice over Internet Protocol ("VoIP") providers and resold the hacked VoIP services for a profit. He was helped by one other hacker. Defendant Vega, by contrast, had a far greater and wide-ranging fraud, controlled more people, and had a greater impact in the criminal world. Vega's sentence should easily be at least twice that of Pena's 10-year sentence.

3. In United States v. Lin Mun Poo, 10 CR 891 (DLI)(E.D.N.Y.), the defendant was sentenced, on November 4, 2011, to 10 years' incarceration after his guilty plea to access device fraud. The defendant was a computer hacker who compromised financial institution computer servers, including

18

the Federal Reserve Bank, for the purpose of stealing credit card information. He sold 31 stolen credit card numbers to an undercover agent and his laptop computer contained 122,000 additional stolen credit card numbers – far fewer than the vast quantities of stolen credit cards in Vega's possession. Poo's Guidelines range was 210 to 262 months. At sentencing, the court stated that but for the 10-year statutory maximum it would have sentenced Poo to a much longer period of incarceration.

4. In United States v. Tony Perez, 11 CR 122 (LO)(E.D. VA.) the defendant was sentenced, on September 9, 2011, to 14 years' incarceration for wire fraud and aggravated identity theft. The defendant was a carder who caused $3 million in losses. Perez's criminal conduct pales in comparison to Vega's based on the scope and magnitude of the conduct. Vega's sentence should be significantly longer than Perez's fraud sentence.

5. In United States v. Jonathan Oliveras, 11 CR 322 (GBL)(E.D.VA.), on December 9, 2011, the defendant was sentenced to 12 years' incarceration. Oliveras bought stolen credit card information from individuals in Russia and distributed the information to a team he managed and encoded plastic cards with the information. Those cards were used to buy gift cards to buy merchandise that was returned for cash. The defendant had 2,341 credit card numbers causing losses of over $770,000.

6. In United States v. Adrian-Tiberiu Oprea, 11 CR 64 (SM)(D.NH), the defendant was sentenced to 15 years' incarceration, for participating in an international, multimillion-dollar scheme to remotely hack into and steal payment card data from U.S. merchants' computers. After being extradited from Romania the defendant pleaded guilty to conspiracy to commit computer fraud, wire fraud, and access device fraud. Ultimately, he and his co-conspirators hacked into about 800 U.S. merchants' systems, and compromised payment card data belonging to more than 100,000 U.S. cardholders, causing losses of at least $17.5 million in unauthorized charges.

19

VII. Conclusion

    For the reasons discussed above, the government respectfully requests that the defendant be sentenced to a substantial term of imprisonment and, at a minimum, to least 20 years' incarceration.

                          Respectfully submitted,

                          LORETTA E. LYNCH
                          United States Attorney
                          Eastern District of New York

               By:  /s/ William P. Campos
                    William P. Campos
                    Assistant U.S. Attorney
                    (718) 254-6104


               By:  /s/ Thomas A. Dukes, Jr.
                    Thomas A. Dukes, Jr.
                    Senior Counsel
                    Computer Crime & Intellectual
                        Property Section
                    Criminal Division
                    U.S. Department of Justice
                    (202) 307-9945


cc:   Matthew Fishbein, Esq.
      Erica Weisgerber, Esq.
      Counsel to Defendant Roman Vega
      (By E-mail)

      Cheryl Fiorillo
      Senior U.S. Probation Officer
      (By E-mail)